M: H: and E. S. Sullivan v. A. M. McMillan et al.—Syllabus.

M. H. SULLIVAN, AS EXECUTOR, AND E. S. SULLIVAN, AS EX-
ECUTRIX, OF D. F. SULLIVAN, DECEASED, APPELLANTS, VS.
A. M. MCMILLAN AND C. L. WIGGINS, PARTNERS AS
MCMILLAN & WIGGINS, APPELLEES.

| 26 | 543 |
| 28 | 624 |
| 26 | 543 |
| 31 | 214 |
| 26 | 543 |
| 32 | 468 |
| 26 | 543 |
| 34 | 72 |
| 26 | 543 |
| 37 | 136 |
| 26 | 543 |
| 39 | 599 |
| 26 | 543 |
| 46 | 92 |
| 26 | 543 |
| 52 | 49 |
| 26 | 543 |
| 53 | 82 |
| 54 | 301 |

1. Where the time for the performance of an executory contract
has arrived, or where the contract is being performed, and one
of the parties notifies the other unequivocally that he will not
perform or further perform his part, or will not accept per-
formance by the other, the latter may treat the contract as put
to an end or entirely broken by the former, and, if ready and
willing to perform his part, sue him at once for an entire
breach of contract, without waiting for the expiration of the
time it would take to complete the contract, and can recover
as damages the same profits that he would have earned had
he entirely performed the contract.

2. Where a party to a contract gives the other unequivocal notifica-
tion by letter that he will not accept further performance of
the contract, and then writes another letter to him consenting
to accept, without raising the question of his obligation to do
so, a specified part performance, of which he has been notified
since writing the former letter, but expressly claiming the
right to raise the question of his obligation to accept it, and
stating that in accepting it he must not be understood as waiv-
ing the position taken in his first letter, the acceptance of
such part performance is not an abandonment of the breach of
contract committed by the first letter, except to the extent of
such part performance, and no further offer of performance is
necessary to authorize the latter party to treat the contract as
entirely broken in so far as it remains unperformed, and sue
for such breach.

3. Where an executor and executrix are sued upon a contract which
upon its face is simply the individual contract of their testator,
it being declared on as such, and the pleadings not setting up
that it is the contract of the testator and others as partners,
the executor and executrix cannot contend that the evidence
shows that it is the contract of an alleged partnership; and
particularly is this so where a plea setting up such defence has
been withdrawn.

4. Co-executors, however numerous, are in law but one person,
and the acts of any one of them in respect to the administra-

tion of the effects is in law the act of all, and where an act done by a person who is sole executor, will bind him as such it will bind both him and his co-executors if· such relation exists.

5. Plaintiffs, one of whom had been told by M. H. S. that he would receive no more logs, wrote to defendants, the executor and executrix of D. F. S., referring to the conversation and asking to be informed whether or not they would receive any more logs under the contract between plaintiffs and the testator. M. H. S. replied, stating that as the letter related to business of the house of D. F. S., of which he was surviving partner, he would reply in that character, and this and the subsequent letters from him were signed in such character, and plaintiffs addressed him as such in their subsequent letter. M. H. S. in his letters notified plaintiffs that he would receive no more logs under the contract because it had been fully performed by plaintiffs and the testator and his representatives. The executor and the executrix being sued as such for an entire breach of the contract, as a contract between them and the testator, do not deny in their pleadings that it is the contract of their testator, which upon its face it clearly is: *Held:* That the letters constituted in law a refusal by the executor and executrix to further perform the contract, and an entire breach of the contract, and not simply a refusal by M. H. S., as surviving partner of the alleged firm.

6. Admissions made by a person against his interest are admissible in evidence, and the entire admission, with all its parts, though they may limit, modify or destroy its effect, should be let in, subject to the rule as to credibility ; but assertions made by one in his own interest, not being a part of an admission, are not admissible as evidence of *themselves* in favor of the party making them.

7. Though declarations or assertions made by one party in his interest in the presence of another, and against the interest of the latter, are not received as evidence in themselves ; they are admissible for the purpose of understanding what reply the party to be affected by them should make. If he has been silent when he ought to have denied, the presumption of acquiescence in them arises.

8. The acquiescence inferable from silence when words are spoken to a person's face, is not inferred from silence as to written

communications. The mere omission to answer a letter is not evidence of an omission or acquiescence in the truth of its statements, and does not render the latter admissible as evidence of the truth of such statements as against the party receiving it. Where, however, there has been a correspondence or exchange of letters, and there is an omission upon the part of one of the parties to reply to statements about which he has knowledge, and which, if not true, he would naturally deny, contained in a letter or letters of the other party which have been replied to, or where he omits reply to a certain letter or letters of the correspondence containing such statements, such omissions are evidence to be considered by the jury in connection with the other circumstances of the case, as tending to show the truth of the statements not replied to. Such evidence is of lighter character than silence is when the statements are made to the face of a party, and an omission to reply to an entire letter or letters of a correspondence is lighter evidence than an ommission to reply to a statement of the kind in a letter otherwise replied to.

9. Plaintiffs wrote to defendants inquiring if they would receive logs in compliance with the contract between plaintiffs and defendants' testator, and indicating their understanding to be that the contract was still unfulfilled. One of the defendants replied suggesting that the contract may have been fulfilled and the necessity for an investigation and that it would be promptly made. Plaintiffs then wrote him repudiating the suggestion, and positively asserting that the contract was in a large part unexecuted. On the same day defendant wrote plaintiffs stating that he had caused the examination to be made and had found that plaintiffs had not only cut over all the lands embraced in the contract, but others not embraced in it, and that the logs cut on the latter lands, which logs he avers plaintiffs had no right to deliver under the contract, were largely more than an offset for any left standing on the contract lands, and announcing in accordance with his former letter that he considered the contract fully executed. On a subsequent day the defendant, he having then received plaintiffs' letter, wrote a third letter, making, in effect, his second letter a reply to plaintiffs' second, except as to one point not material to be noticed here. These letters were put in evidence by plaintiffs, who after the receipt of defendant's last

letter, moved off their teams and ceased to perform the contract and sued defendants for an entire breach of it: *Held*, (1). The statements of the second and third letters of defendants are not admissions against their interests, but assertions or declarations in their interest; (2) That the jury were not wrong in finding that the plaintiffs did not acquiesce in the statements or conclusion of defendands' second and third letters.

10. An erroneous charge is not ground for setting aside a verdict which is in accordance with the law and the evidence.

11. The fact that one party to a suit introduces letters in evidence does not of itself make their contents evidence against him.

12. Where, in a correspondence between parties, one of them has controverted the proposition previously suggested and subsequently asserted by the other, but has failed to reply to subsequent letters of the latter party asserting such proposition and making allegations of fact as the ground of his conclusion, it is error to charge the jury that if there are any statements in the letters of the latter party against the former's interest that are not replied to or denied, they are to be considered as admitted by the former party.

13. Where, pending the performance of an executory contract there is an entire breach of it by one party for whom the work is to be done, and the other party thereupon sues him, the measure of damages is the difference between what it would have cost to perform the contract, and the contract price, had it been entirely executed. In estimating the cost of performance, the price of labor and materials, etc., at the time of the breach, will govern, without regard to subsequent fluctuations. The elements of cost should be ascertained from reliable sources, from practical men having experience in matters of the same kind, and not from loose and speculative opinions. The less time the party who is to do the work is engaged in consequence of the breach, and the consequent release from care, trouble, risk and responsibility, and all necessary items of expense, including also those which though contingent are almost inseparable from the performance of the contract, as well as the value of the use of property necessarily employed in performing the contract, and all outlays of capital for labor, material, etc., should be included in the estimate of the cost.

14. A contract for the cutting and delivery of all logs of not less than specified *minimum* dimensions on designated lands, provided that one hundred logs should be delivered daily by one of the parties if the other should require the delivery of that many, and it appeared from the testimony that at least an average of one hundred had been delivered daily up to the time of the breach of the contract, but not that the other party had required it, and in an action of damages by the former party for an entire breach of the contract by the latter, the judge charged the jury upon the theory of the necessity for the delivery of that many daily: *Held,* a proper charge, for the reason that when the action is brought before the expiration of the time required for full performance of the contract, the damages are to be estimated according to the state of circumstances existing at the time of the breach, and moreover it was necessary to settle upon some number as deliverable in order to ascertain the time it would have required to complete the performance of the contract, which time was indispensable to an ascertainment of the cost of performance.

15. Pending the performance of an executory contract for cutting and delivering logs, there was an entire breach of it by the party for whom the work was to be done, and the other party sued him for damages, and the evidence showed that the logs were hauled by teams from the land to the place of delivery, and, according to the average daily delivery—one hundred logs—at the time of the breach of the contract, that it would have taken about two years to complete the contract if it had been fully carried out, but there was no evidence as to the value of the use of the teams: *Held,* that the value of the use of the teams was an essential element of the cost of delivering the logs, assuming that either one hundred or less had to be delivered daily, and that the testimony, consequently, did not show what would have been the cost of delivering the remaining logs, or completing the contract, and the verdict should have been set aside.

16. An assignment of error upon a point as to which there has been in the trial court an admission upon the trial, as shown by the bill of exceptions, that the amount recovered, to which the assignment relates, is actually due by the party assigning the error in the Appellate Court, need not be passed upon by latter court.

Judgment reversed.

Appeal from the Circuit Court for Escambia County.

*R. L. Campbell, P. W. White,* for Appellants.

*W. A. Blount,* for Appellees.

### STATEMENT.

This is an action brought in Escambia Circuit Court by appellees against appellants, as the executor and executrix of Daniel F. Sullivan, deceased. There was a trial by jury and a verdict in favor of plaintiffs for $17,028 on the first count, and for $1,229 with interest at eight per cent. from October 1, 1884, on the other counts, and the clerk having computed the interest at $224.20, judgment was entered accordingly, and the defendants appealed, a motion for a new trial having been overruled.

The contract sued on was entered into on the 24 h day of August, 1882, by Daniel F. Sullivan, since deceased, and the appellees, to take effect on the 22d day of the then ensuing October, and the appellees agreed to deliver in a boom on Hall's creek, near the trestle of the Pensacola & Selma railroad, all logs "sixteen feet long and up," and "fourteen inches in diameter and up, at the small end," on the lands of Sullivan within two miles on each side of that creek, the "logs to be free from wind shakes, red heart, rotten, hollow knots or cat faced;" they (the appellees) "to clean all logs off the above land and not to make any unnecessary waste of or destroy the timber." Sullivan was to pay for the logs so delivered at the rate of five cents per cubic foot. The logs were to be inspected by a qualified inspector to be appointed by Sullivan, at the joint expense of both parties, of five cents per log, and payment for the logs so delivered was to be made at the office of the Molino Mills, Molino, Escambia county, Florida, upon presentation

of certificates of inspection and measurement, the appellees agreeing "to deliver one hundred logs daily if required by" Sullivan.

The first count of the declaration alleges the making of the contract, and that the plaintiffs, appellees, have done and performed all things required to be performed on their part thereby, and that they had cut and delivered and were paid for many logs by the said Sullivan and the defendants, but that although they, the plaintiffs, have not completed their contract and there were at the time of the refusal by the defendents herein mentioned, and at the time of the institution of this suit, and are within the limits specified, many trees from which logs could be obtained of the size, class, character and quality mentioned in the contract, yet to be cut and delivered, and although the plaintiffs have been at all times ready and willing, and have proffered to the defendants to complete their contract, yet the defendants have refused to allow them to proceed with the same, and to cut and deliver more logs in accordance therewith, and have refused to appoint an inspector to inspect logs cut by plaintiffs and delivered at the place specified in the contract, and have refused to pay for certain logs thus delivered, and refused to pay for certain logs cut, delivered and inspected in accordance with the contract; and that thereby plaintiffs have lost great gains and profits, viz: $25,000, which otherwise they would have made.

The second count is, that D. F. Sullivan was in his life time, and the defendants, as his executor and executrix, indebted to plaintiffs in the sum of $1,229.89 for logs cut and delivered in accordance with the contract. The third count is similar to the second, except that its allegations are confined to indebtedness by the defendants, and the fourth

count is one of account stated between plaintiffs and defendants.

The correspondence referred to in the opinion is stated as follows in the bill of exceptions. Wiggins, one of the plaintiffs, having testified as stated in the opinion, introduced the letter of October 18th, which is as follows:

PENSACOLA, FLA., Oct. 18, 1884.

*M. H. Sullivan, Executor, and Mrs. Emily S. Sullivan, Executrix, estate of D. F. Sullivan, deceased:*

DEAR SIR AND MADAM—We have a contract signed by us and the late D. F. Sullivan, August 2, 1882, by the terms of which we are to cut and deliver all logs of a certain dimension on certain land within two miles of Hall's creek. In a conversation with Mr. M. H. Sullivan, of date October 10, 1884, he announced his determination to receive no logs cut and delivered under said contract other than logs which we consented to cut under a special bill. As the trees for such logs are exhausted, or nearly so, and we shall only have short logs to cut and deliver, it is important for us to know at once whether you will receive under said contract all logs which shall be in compliance with the contract, but which may not be such special long ones. An early reply will oblige yours, very truly,

MCMILLAN & WIGGINS.

And said witness further testified that to the foregoing letter, the following letter in reply was received by the said plaintiffs, which was then and there produced and read in evidence by plaintiffs' attorney:

PENSACOLA, FLA., Oct. 20, 1884.

*Messrs. McMillan & Wiggins, Pollard, Ala.*

GENTLEMEN—Yours of the 18th instant, addressed to the executor and executrix of the late D. F. Sullivan, has been received. As it relates to business of the late house of D. F. Sullivan, of which I am the surviving partner, I reply to your letter in that character. Without regard to the conversation to which you allude, I now announce to you my

readiness to fulfill the contract to which you refer, so far as it may be found to remain unexecuted; and for the purpose of determining that fact, I shall at once institute an investigation, and my action will depend upon the result. You are, of course, aware that your transactions under the contract, except that many logs have been delivered from time to time, are unknown to me or any one in the employ of the house of D. F. Sullivan, and hence the necessity for such an investigation to determine how far you have complied with your side of the contract; what has been the extent of your cutting, and what territory remains uncut, if any; for though the agreement is unlimited by any stated time, it is territorially limited. The reasonableness of the delay which the inquiry will involve, I am sure you will be so frank as to admit, for you must feel that it is as important to me that your legal duties and restrictions shall be observed, as it is to you that the legal obligations of D. F. Sullivan should be performed. Assuring you of prompt action in the matter, I am

Respectfully, yours,

M. H. SULLIVAN,

*As surviving partner of D. F. Sullivan.*

And the said witness further testified that to the letter last above set forth the said plaintiffs wrote to defendants the following letter in reply, which was then and there produced and read in evidence by plaintiffs' attorney:

PENSACOLA, FLA., October 28, 1884.

*M. H. Sullivan, Esq., as surviving partner of D. F. Sullivan:*

DEAR SIR—Your letter of the 20th is at hand. In it you, in effect, ask us to allow you to assume that we have violated our contract, and to give you time to prove it. You will pardon us, but we cannot do so. We assert and we insist that we have in all respects complied with our contract, and that it is in large part unexecuted. If you are able to assert and prove the contrary, then of course you are right to refuse to go on with the contract, but if you are not able, it is asking too much of us to suspend our rights in order that you may satisfy yourself whether we

are acting honestly or not. In this view we must again say to you that we have logs at the place of delivery under the contract which your inspector has declined, which we demand that you shall inspect and receive. Since he has, under your orders, already refused, if within one week from the receipt of this letter by you, you do not announce to us your readiness to receive them, we shall take it as final refusal to go on with the contract.

MCMILLAN & WIGGINS.

And the said witness further testified that to the letter last above set forth the plaintiffs received the following letter in reply, which was then and there read in evidence by plaintiffs' attorney :

PENSACOLA, FLA., October 31, 1884.

*Messrs. McMillan & Wiggins, Pollard, Ala.:*

GENTLEMEN—My letter of 28th inst. anticipates and meets all you have to say in yours of the same date which has just been received, except upon one point, namely, as to the logs now in the boom, and to that I shall confine my reply.

Those logs, I am ready to receive, and have given instructions that they shall be received under the contract without raising any question, as I claim I have a right to do, in regard to my obligation to do so under the contract for reasons stated in my letter of 28th inst. But in so receiving and paying for them I must not be understood as waiving the position assumed in that letter, that the contract has been fully executed by you and D. F. Sullivan and his representatives.

Yours very respectfully,

M. H. SULLIVAN,
*As surviving partner of D. F. Sullian.*

And the said witness further testified that the following letter was received from the defendant, M. H. Sullivan, which letter was then and there produced, and by plaintiffs' attorney read in evidence :

PENSACOLA, FLA., October 28, 1884.
*Messrs. McMillan & Wiggins, Pollard, Ala.:*

GENTLEMEN—Having caused an examination of the territory within two miles of Hall's creek to be made, I find you have not only cut over all the lands embraced in your log contract with D. F. Sullivan, but you have cut other lands not within the prescribed limits. It is true there may be some scattering trees left apparently large enough for logs, but as you passed them by whilst cutting the locality in which they occur, it is but a fair inference that you did not then consider them proper material for the fulfillment of your contract, and if then thus impliedly condemned by you, I can see no just and sufficient reason for your attempt to bring them under the contract. Besides, the logs cut outside of the two-mile limit, which you had no right to deliver under the contract are largely more than an offset for the refuse trees standing within the contract limit and in the midst of your cutting. I, therefore, in accordance with my letter of the 20th inst., announce to you that I consider the contract fully executed upon your part and that it imposes no further obligation upon the representatives of D. F. Sullivan.

Yours respectfully,

M. H. SULLIVAN,
*Surviving partner of D. F. Sullivan.*

And thereupon, said witness proceeded further to testify as follows: When I received letter from Mr. Davis I was executing contract by cutting short logs. I stopped until I could see Mr. Sullivan. After receiving last letter from Mr. Sullivan I moved my teams from Hall's creek.

The other facts of the case are stated in the opinion.

*R. L. Campbell, P. W. White,* for Appellant.

*W. A. Blount,* for Appellees.

### FIRST ASSIGNMENT OF ERROR.

The applicants do not insist upon any of the breaches assigned in the declaration except the defendants "refused to

allow plaintiffs to proceed with said contract and to cut and deliver any more logs in accordance therewith," and I confine my discussion to that. As to that, appellants first contend that there was no refusal by the *executors*, and, secondly, that there was no refusal at all.

First. This contention of appellants rests upon an attempt to say that the refusal of M. H. Sullivan, claiming to be surviving partner, does not bind M. H. Sullivan, the executor, and through him the estate. In examining this position let us first eliminate Mrs. E. S. Sullivan. Her nonaction is immaterial, for the action of one joint executor binds all.

Schouler on Executors and Administrator, 400.

So that M. H. Sullivan's acts are to be taken as if he was the sole executor. Now then, assuming that he was surviving partner and executor, does the refusal which the record shows bind the estate?

Of course, if the surviving partner were a person other than the executor, his acts would not bind the estate, so as to authorize suit against it, but when the two characters are blended in one individual, it would seem equally clear that the annunciation by that individual of *his* course of action, would bind the estate. If the announcement could appertain only to an act which could be done by him as surviving partner only, of course it would bind him only in that capacity. If it could appertain only to an act which could be done by him as executor only, of course it would bind him only in that capacity; if it could appertain to either of these characters it could be taken to be action in either capacity, unless there was a distinct announcement that it was taken in one and not in the other. In this case there is no such announcement.

This is a contract which purports to be with D. F. Sulli-

van.  M. H. Sullivan refuses to receive logs under it.  He
is known to be an executor and a letter is addressed to him
and his co-executrix in order to ascertain the position of
the executors as to the contract.  He answers the letter in
the character of surviving partner and postpones a definite
reply.   That reply comes in his letter of the 28th of Octo-
ber, 1884, and the 31st of October, 1884.  He does not in
any of his letters, announce that he will not go on with the
contract as surviving partner, but will as executor, and he
draws no distinction between the rights or the intentions of
the executorship and ownership, but announces what *he* is
going to do, and *his* position as to the contract, without
saying in what capacity that position is assumed.  This
ambiguity is preserved until the last two letters, when he
shows that he acts distinctly for the estate.  He announces
in the letter of the 28th of October, that the contract im-
poses no further obligation upon the *representatives* of D.
F. Sullivan, and in the letter of the 31st of October, that it
"had been fully executed by you (appellees) and D.F. Sulli-
van and his *representatives*."  If he was speaking only for
the surviving partner, his announcements should only have
been for him, and not for the *representatives* of D. F. Sulli-
van.   The surviving partner was in · no sense a representa-
tive of D. F. Sullivan, but simply had well defined rights
connected with the property and business of the firm, but
if he was a representative, he speaks not alone for himself,
but also for the other representative or representatives.
Who was he or were they?   Clearly he and his co-execu-
trix, or he as executor acting for himself and her.   So that
we find him speaking solely as of the legal representatives
(the executors) or as surviving partner and executor, and
in speaking thus he announced the determination of the
estate, as to the contract with appellees, and the estate being
a party to the announcement was bound thereby.

37

We have thus far assumed that M. A. Sullivan was surviving partner as well as executor. But the assumption has been made for the purpose of the argument because appellants assumed it. But there is no proof of it. The suit is brought against defendants as executor snd executrix. There is no denial of their sole liability upon it. On the contrary they interpose a plea in abatement that M. H. Sullivan was surviving partner, and afterwards withdrew it, showing that it was not tenable. So far as the record is concerned then, we have a person admitted by the pleadings to be an executor, attempting to cause the estate to escape from the consequences of his act, saying that he admitted acts concerning the contracts of the deceased were done by him not as executor, but in the assumed character as survivor, putting it mathematically. Given an individual, who is executor, given an absence of any other capacity in which he can represent the deceased, given an act relating to the affairs of such deceased, and it follows irresistably that such act is his act as executor.

Nor does it make any difference that the appellees addressed him as surviving partner. Their mode of address cannot change the character in which he was alone authorized to act, nor can they be estopped by such address made when they believed his representation from suing the executors (when they found his representation to be untrue) upon an act which he could only do as executor.

The trap which the caution (so often mentioned by appellant's attorney) of M. H. Sullivan set for appellees did not spring well, for it was set upon a false foundation.

Secondly—As to appellant's contention that there was no refusal at all.

The appellants say that there was no *prevention* and that prevention requires acts—of which there is no proof. Even

if this were so, a refusal to proceed by the defendant is equivalent to a prevention of the plaintiff.

Cort vs. Ambergate, &c., 6 Eng., L. & Eq., 230. The declaration, however, only alleges a *refusal to allow* plaintiffs to proceed with their obligations under the contract. It is not necessary, as contended by appellants, that plaintiffs should have continued to cut and offer to deliver logs after appellants had refused to receive them, and had announced the contract to be at an end, but such refusal and announcement of the defendants authorized the plaintiffs to desist at once and sue for the profits they would have made.

> Hochster vs. de la Tour, 20 Eng., L. & Eq., 157.
> Cort vs. Ambergate, &c., R. R. Co., 6 Eng., L. & Eq. 230.
> Ripley vs. McClure, 4 Ex., 345.
> Dabune, &c., Xenos 11, C. B. (N. S.) 152.
> Jones vs. Barclay, 2 Doug., 84.
> Smith vs. Lewis, 24 Conn., 624.
> S. C., 63 Am. Dec., 180.
> Tenney vs. Ashley, 15 Pick., 546.
> Carpenter vs. Holcombe, 105 Mass., 280-285.

The question is then, was there a refusal by the defendants to proceed with the contract? Of this, there can be no doubt.

Wiggins testified, without a denial, that M. H. Sullivan refused to receive any more logs because the mill had burned. This refusal has never been withdrawn. After it was made, plaintiffs, in order to "get him down in writing," wrote their letter of the 18th. They therein requested defendants to go on with their contract, and thereby offered to go on with theirs.

> Tenney vs. Ashley, 15 Pick., 552.

The object of that letter was to ascertain whether the de-

fendants were going on with the contract.   M. H. Sullivan answers it on the 20th.   He does not repudiate his former renunciation of the obligations of the contract, but asks for time in which to ascertain whether he will stand by that repudiation.   He takes the time, makes an investigation, and then answers that he considers the obligation of the contract on D. F. Sullivan's representatives at an end.   He subsequently decides to take the logs already cut, but re-affirms his position already assumed that the representatives of D. F. Sullivan have nothing further to do under the con-tract.

M. H. Sullivan had declined to go on with the contract. A correspondence is instituted for the purpose of ascertain-ing his fixity of purpose in so declining.   He says in the first of the correspondence that he will go on with it so far as unexecuted, which of course, is an affirmation that if executed he will not go on.   He makes an investigation for the purpose of ascertaining whether he shall go on or not, and the investigation being made, and the condition which he had fixed to authorize him to refuse to proceed, being found to exist, he answers that there is no further obliga-tion upon D. F. Sullivan's representative to proceed. Could there be a clearer refusal to proceed ?

There is at first an unqualified refusal, then there is a suspension of that refusal till it can be ascertained whether or not the contract, in the opinion of M. H. Sullivan, has been executed, and then there is an announcement that in his opinion it has been executed.   He says in substance in his first letter :   "You must not take any verbal refusal as final until I find that it was well founded, and so announce to you."   In his second letter, he says in substance : "I have found that my refusal was well founded and I in ac-cordance with my letter of the 20th so announce to you,"

and in his last he affirms this announcement and thereby affirms and reaffirms his refusal to proceed.

Defendants (appellants) however, say that M. H. Sullivan only expresses his *belief* that the contract was complete, *i. e.* he did not say that his future action would be in accordance with that belief. As Lord Eldon says, this is "too thin." The object of the correspondence on both sides was not to arrive at M. H. Sullivan's belief, for plaintiffs felt no interest in his abstract mental operations, but to arrive at what his future action would be, and he himself was to form his belief for the purpose of announcing it to the plaintiff in determining his future action, for he says that he will go on with the contract only so far as it is executed and that he will inform himself upon that point, *i. e.* will arrive at a belief, in order that its announcement to plaintiffs may indicate to them whether he will go on with the contract or not.

Besides, "consider" does not only mean "believe." When one upon being pressed to go on with a contract, which he has heretofore refused to proceed with, answers that he "considers" it at an end, there could be no more positive annunciation of his determination not to proceed with it.

If there were any doubt, however, whether this letter of the 28th was a determination and an announcement of such determination, that doubt is removed by the letter of the 31st, in which he announces that he adheres to the *position* assumed in that letter (of the 28th) that the contract had been fully executed by you (plaintiffs) and the representatives of D. F. Sullivan.

The *belief* had crystallized into a *position*. And this was a position assumed in answer to an inquiry as to whether they (the defendants) were not going on with the contract. They are asked "Will you proceed with the contract?" They answer "not if it is executed, and we assume the position

560 SUPREME COURT.

M. H. and E. S. Sullivan v. A. M. McMillan et al.—Assignm't of Error.

that it is not." Can anything be more conclusive than this? Even without a verbal refusal, this would be sufficient, but as we have shown that was never recalled, but only suspended during the investigation. But whether recalled or suspended, it shows the subject-matter of the correspondence, and fixes the position assumed as one not to receive any more logs because already cut, but sustained as to the part to be executed, *i. e.* as to those not cut—as to *future* deliveries of which appellant speaks so often.

I have, because appellants have done so, analyzed this correspondence critically, but I would be perfectly willing to let the Court, without such analysis, look at the whole correspondence and say whether or not the appellants did not intend to make appellees believe that they would not complete the contract and whether or not they will now be allowed to split hairs and to say, by the use of acrobatic hermeneutics, that their language does not sustain any such conclusion.

The appellants contend that appellees consented, by withdrawing their teams, to the conclusion of M. H. Sullivan that the contract was completed. They consented perforce, for he had announced that he would not go on, and appellees were compelled to believe him, and now he complains that they did not believe him, and acted accordingly.

### SECOND ASSIGNMENT OF ERROR.

Appellants further contend that the motion for a new trial should have been granted, because there was an issue before the jury as to whether the appellees had gone outside of the contract limit of land and cut logs on such outside land and delivered them to appellants as contract logs then remaining uncut within the contract limit ; that the appellants introduced evidence to show this ; and that there being no

evidence to the contrary, the jury was compelled to find for the appellants. The evidence relied upon are the statements of M. H. Sullivan in his letter of October 28, 1884, to appellees, which letter was not replied to and consequently the statement was not denied by appellants.

As we understand the position of appellants, it is that appellees were bound by all the statements in the letters they introduced, and could not controvert them; and that, if they were not so bound, yet, not having denied them, they were presumed to have admitted them, and there being nothing *contra* to this presumption, the jury should have found the issue in favor of appellants.

We deny both these propositions of law.

First. Is a party bound by all the statements in the letter of the opposite party, which he introduces to show the action of such other party?

He certainly is not. When he introduces any part of the letter as an admission, he must introduce all those parts which will explain or modify the admission. But he is not even compelled to introduce all the letter if it contains indepedent matter in connection with the admission. 7 A. & E. 627.

And even if introduced, it is not evidence for the person writing the letter.

> Fowle vs. Stevenson, 1 Johns. Cases, 110.
> Proprietor's Lessee vs. Ralston, 1 Dall., 18.
> Bishbeck vs. Burnes, 2 Hall (C P. N. Y.) 51.

In this case, however, the letters were not introduced for the purpose of showing an admission, and did not contain any admissions by the writer against the interests of the appellants. The issue was whether the appellants refused to allow the appellees to go on with the contract. To prove the affirmative, three letters were introduced

by appellees, showing the *action* of the appellants and not their admissions. Now, then, it seems too evident for argument that the reasons given by one for not performing a contract, even though given at the time of the refusal, cannot be evidence for him of any facts which he alleges to exist as a basis of those reasons. If such be the rule of law, any one breaking a contract, may by asserting, at the time of the breach, the existence of facts justifying it, manufacture evidence for himself by his own assertion and the other party could not prove the breach without at the same time breaking down his case by proving facts by which he was bound.

> LaForce vs. Kneeland, 7 Cowen, 459.
> Robbins vs. Harvey, 5 Conn., 335, 1 Dall., 18.

The case of Newton vs. Ins. Co., 22 Wall., is not *contra*. It merely decides that all parts of an admission modifying or limiting must be taken together, but it does not decide that the reasons of one party who refuses to act are binding upon the other who introduces evidence of such refusal.

In this case it would be manufacturing evidence for himself by repeating what he had heard others say, for Sullivan did not state the facts as of his own knowledge, but merely as the result of an investigation he had made.

But if the appellees, introducing the letters, were not bound by the facts alleged in M. H. Sullivan's reasons, is the allegation of those facts in those reasons, evidence at all against them, or in appellants' favor? Just as clearly not, as that it would not be conclusive against appellees. The conclusive effect differs only in degree from the *prima facie* effect. In the former the effect cannot be avoided; in the latter, it can only be avoided by throwing the burden of disproof on the appellees. In both instances, M. H.

Sullivan would be allowed to manufacture evidence for himself by a statement of what somebody else had told him:

But if the whole letters were governed by the rule concerning admissions, and all their contents were to be taken as evidence, it was for the jury to give such weight as they saw fit to that which made for the writer and to disregard it altogether if they wished.

> 1 Greenleaf Ev., 201.
> 26 N. J. (Law) 614.
> Smith vs. Hunt, 1 McCord., 449.
> Newman vs. Bradley, 1 Dall., 240.

Especially, when other parts of the assertion that the timber had been entirely cut off the land and that only a few scattering trees were left, was proven to be untrue. The jury could very well say : " *Falsus in uno,*" &c.

> M. E. Church, *et al.*, vs. Jaques, *et al.*, 3 Johns. . Ch., 116.

And they could regard the fact that this was a vital issue to the appellants, and yet they did not produce any evidence whatever of it, although the persons (Lowell and Lee) whom they had sent especially to examine, were present and on the stand. What weight could a jury give to a man's assertion made in his own favor, a part of which is proven false, and the other part of which he makes no attempt to sustain either by his own oath, or by the oaths of others who are in position to know, and who are present and on the stand. And this omission, too, was in the presence of abundant time in which to obtain the testimony.

> Barnes Ex'tr vs. Keely, Hayw., 45.

But appellants say that the neglect of the appellees to deny the allegation of the letters as to going outside the contract limit, raises a presumption of the truth of the allegation, which presumption should have been met by ap-

pellees, and that it was not met, the jury should have found for the appellants.

No such presumption arises from the failure to answer a letter, whatever may be the rule as to silence where an allegation against interest is made verbally.

Fairlie vs. Denton, 3 C. & P., 103.

Artome vs. Cort, 2 Hall (C. P, N. Y.), 40.

But, even in the case of an allegation against interest made verbally, there is no inflexible presumption that the silence admits the truth of the allegation. It depends upon the circumstances attending the allegation, as to whether the person against whom it is made is requested to answer it or not.

State vs. Hamilton, 55 Mo., 523.

1 Greenleaf Ev., Sec. 197 ; 26 N. J. L., 613.

In this case there would have been no reason in responding to the letters making the assertion. The appellees had stated their whole case, and merely asked appellants to answer whether they intended to go on with the contract? Appellants answered that they did not intend to go on.

This was an end of the matter so far as any issue was to be reached by correspondence. The appellees had obtained a direct and decided answer to their question and it would have been idle and useless to further discuss the reason upon which appellants founded their answer. Moreover, a mere neglect to answer does not create a presumption of law. It is admissible as evidence for the purpose of allowing the jury to draw an inference from it, *i. e.* of raising a presumption, but being a presumption of fact, it is entirely for the jury to say whether they will or not draw any such inference. The admission of the evidence does not bind the jury to draw the inference.

Hamilton vs. People, 29 Mich., 193.

1 Greenleaf Ev., Sec. 48.

And whether they shall give it any weight, and if any, what weight, is for them to decide.    And to lead them to form a presumption, the circumstances under which the appellees were silent, must be such as to lead to a conscientious belief beyond a reasonable doubt that, if the facts which they 'fail to deny, were not true, they would have denied them:

> Hunt vs. Hunt, 3 Metc., 175.
> S. C. 37 Am. Dec., 130.

Applying these principles to the facts of this case, there can scarcely be a doubt that the jury was right in refusing to draw the presumption contended for, and that if wrong, yet that it was a matter entirely for them to decide, and the verdict cannot be set aside for this reason.

As to the contention that the verdict was in this particular contrary to the charge of the court below, the simple answer is that an appellate court does not reverse for such a reason unless the charge of the court was below in accordance with the law, when it would reverse because the verdict was against the law and not because it was against the charge of the court.

#### THIRD ASSIGNMENT OF ERROR.

The contract was not to deliver 100 logs daily at all events, but only if required, and there is no showing that this contingency had ever happened or would ever happen. But if it was necessary that this contingency should have been taken into the computation, there was abundant evidence by which the jury could do so.

. Wiggins' testimony was that the logs could have been delivered at a profit of a cent and a half a cubic foot. This was without any limitation as to number or as to time of delivery and applies as well to 100 or 1,000 per day as to 10 per day.

If there was any difference between the profit to be made in delivering 100 per day and in delivering a lesser number per day, no such difference appeared upon the trial. Appellants ask the Court to assume that such difference existed without any evidence to justify such assumption, although such difference, if it existed, could readily have been elicited by them either upon cross-examination or by testimony from their own witnesses. They, however, failed to do so, and now attempt to supply the place of evidence by inference and argument.

The inference they draw is that the logs left on the land could not have been delivered as readily and cheaply as those which had already been delivered because of the obstruction by the tops of the trees already cut, and because those nearest the place of delivery would naturally be the first utilized. The last is the merest presumption without any foundation whatever in the evidence, though, indeed Wiggins allowed for it in making the average distance upon which he based his computation, one and one-half miles instead of one mile, which it would have been if the territory had been uncut, and the first is an inference drawn against the facts and against positive testimony. It is against the facts, because it is in testimony that the very purpose of cutting over the land more than once was to allow these tops to get out of the way by decay. In this case two years had been consumed without getting over the land, and yet the Court is asked to presume that the two years would not be sufficient for green and sappy tops of pine to decay sufficiently to go over it again with equal facility as at first. It is against positive testimony, because Godwin testifies that "it would have been as cheap to deliver the logs left standing as those that were hauled away," and outside of Wiggins' testimony it had been shown by

Godwin, that he had made a "good deal of profit" at 4 cents per foot.

But appellants say that there was affirmative evidence that this profit could not have been made in delivering 100 logs daily. It will be noticed, Sowell & McDavid, who so testified, drew no distinction between the profit to be made in delivering a greater or lesser quantity, and their testimony can not be taken as demonstrating that there was any more difficulty and expense in delivering the 100 logs daily than in delivering a smaller number, and if it can be, it is as a contradiction of the testimony of Wiggins and Godwin.

But whatever it may have conveyed, the jury were at perfect liberty to disregard it, for they themselves showed the utter worthlessness of it.

McDavid undertook to testify that there would be no profit in the delivering of the 100 logs daily, when he had never cut and delivered but 300 or 400 logs years before, from which he made no profit, and he knew no single element of the cost of feeding teams, or of hauling logs, or of running them down the ditch.

Lowell, who had not logged for ten years, confessed the same ignorance of all these, the ignorance of any one of which was sufficient to show his incapacity to make a calculation in which each one was necessarily an element.

The jury and the judge before whom it was tried and who had the witnesses before them, discredited their knowledge and hence their testimony, and this court will not, not having even the same means of information, differ from them.

RANEY, C. J. An issue is made by the pleadings on the first breach of the contract alleged in the declaration, which breach is that the defendants refused to allow plaintiffs to proceed with the contract, and to cut and deliver any more

logs in accordance with it. That there is not sufficient evidence to support this allegation of a breach is the first point contended for in behalf of appellants. The position of their counsel is that the evidence, if any, of a "prevention" of performance, must be found in the correspondence consisting of the five letters set forth in the partial statement preceding this opinion. There is, however, in the bill of exceptions, testimony in addition to these letters, upon which appellees rely in part to sustain the alleged breach. It is this : Wiggins, one of the plaintiffs, testifies that they worked under the contract two years, but were idle in October and November, 1884; that he was first notified by Mr. M. L. Davis, who always paid for the logs, to stop getting logs. He had recognized Davis as superintendent of the Molino Mills, Davis having given him checks on D. F. Sullivan, and after June, 1884, on M. H. Sullivan ; that Davis wrote plaintiffs a letter dated October 5, 1884, which, omitting formal parts, is : "You will stop cutting short logs. You can go on with the bill logs." That witness complied with the request, but kept on cutting "*bill logs*," not under contract; "short logs" were under contract, but "bill logs" not so ; that immediately after getting the above letters he went down to see Davis and Sullivan, and Davis told him to see Sullivan, but the latter was in New York, and he did not see him, but as soon as Sullivan came back witness went down again to see him. Of this meeting, another witness says : "He told me then not to cut and deliver any more timber. I went down to see Davis and Sullivan. Davis told me to see Sullivan. M. H. Sullivan told me he would take no more logs, as the mills having burned down, he wanted none." After this, he says, plaintiffs wrote the letter of October 18th.

Referring to the correspondence, it is evident that the

purpose and meaning of the plaintiffs' letter of October 18th, was to ascertain from the defendants whether the latter would continue to receive logs which the former might cut and deliver in accordance with the contract sued on, or would refuse to do so. A legitimate inference is that they did not care to act upon the verbal declarations made by Sullivan in his previous conversation on the same subject, although they were neither uncertain or unmistakable in meaning, that no more logs would be received. To this letter there are two replies, one dated the 20th and the other the 28th of the same month. The former of these replies, is in effect, an accouncement of the writer's readiness, notwithstanding what he had said in the conversation alluded to, to fulfill the contract in so far as it might be found upon examination to remain unexecuted; but that he was not informed whether it had not been entirely executed, and it consequently, was necessary for him to make an investigation to ascertain what was the fact upon this point; that he would do this at once and that his action as to receiving or refusing to receive any more logs would depend upon the result of such investigation. The second reply states in substance, that the promised examination has been made, and after giving reasons, doubtless satisfactory to himself, concludes with the announcement that he considers the contract fully executed upon the part of the plaintiffs, and that it imposes no further obligation upon the representatives of D. F. Sullivan. Considering these two letters together, and in connection with that to which they are responses, we are unable to reach any other conclusion than that they were a distinct and positive notification to plaintiffs that no more logs would be received under the contract. In the first he says in effect: I will investigate as to whether the contract has been fully executed, and

570        SUPREME COURT.

M. H. and E. S. Sullivan v. A. M. McMillan et al.—Opinion of Court.

if I find that it has not been, I will receive logs to the extent or in so far as it remains unexecuted, but if I find that it has already been executed, I will receive no more logs under it. In the second, he says in substance : I have made the promised investigation, and found it has been fully executed by plaintiffs, and there is nothing to be done under it by the other party to it or his representatives. Admitting the declaration that the contract imposes no further obligation upon D. F. Sullivan or representatives, not to be tantamount, if considered alone, to a statement or notice that no more logs would be received, we · yet do not think it necessary that any such statement should have appeared in the second letter to give the two letters the effect which we attribute to them. Sullivan's first letter, read in connection with the plaintiffs' letter, was a clear and unequivocal notification from Sullivan that he would receive no more logs if he should find that the contract had been fully executed, and the second letter informs plaintiffs that he has so found, and it in no wise withdraws or qualifies the notification which the previous letter had annexed to the result or conclusion announced by the latter one. A simple notification of the investigation and the result or conclusion arrived at, was all that remained to be done by, or was to be looked for from Sullivan, after the first letter. Nothing more was necessary to inform the plaintiffs as to the writer's intention, purpose or decision, as to receiving any more logs under the contract; and further inquiry on the part of the plaintiffs would have been idle or superfluous. Admitting that the word " consider," as used in the second letter, is expressive of the *judgment* of the writer as to whether or not the contract has been completed, it was this, and nothing else, that the first letter had informed the plaintiffs would control the writer as to receiving or refusing

more logs under the contract. The second letter is the complement of the first, and the two are a reply giving to the plaintiffs' inquiry the answer that no more logs would be received.

It is necessary to inquire as to the effect upon the above conclusion, of two letters thus far unnoticed. These letters are that from plaintiffs dated October 28th, and Sullivan's reply to it. The former of these letters is a reply to Sullivan's letter of the 20th of the same month. Construing, as it does, Sullivan's letter of the 20th, to assume that plaintiffs had "violated" the contract, and to ask time for proving that they have done so, the plaintiffs decline to give time, and insist both that they have in all respects complied with their contract and that it is still in a large part unexecuted. It then observes that Sullivan is right to refuse to go on with the contract, if he is able to assert and prove that the contract has been executed, but, if he cannot do this, it is asking too much of them to request a suspension of their rights in order that he might satisfy himself whether they are acting honestly or not. Professing to act in accordance with the views expressed, it notifies Sullivan that plaintiffs have some logs at the place of delivery, under the contract, and demands that they be inspected and received, stating that they have been already refused by the inspector under Sullivan's orders. It also notifies him that if within one week from the receipt of this letter he does not announce to them his readiness to receive those logs, they will take it as a final refusal to go on with the contract. This letter elicited Sullivan's of the 31st, in which Sullivan says in substance that his of the 28th anticipates and meets plaintiffs' of the same date, or, in short, answers it as to everything in it except the logs referred to as being in the boom or place of delivery, and that as to these he shall confine his reply.

These logs, he says, he is willing to receive, and has given instructions that they shall be received under the contract, without rasing any question in regard to his obligation to receive them, which question, he claims, he has for reasons stated in his former letter, the right to raise. He also says, that in so receiving and paying for these logs he must not be understood as waiving the position taken by him in his former letter, that the contract has been fully performed by plaintiffs and D. F. Sullivan and his representatives.

Counsel for appellants argues that in the former of these two letters, plaintiffs made the failure of Sullivan to receive or accept the specified logs within the time stated, the test of his refusal to go on with the contract, but that instcad of refusing them, he by his last letter accepted them, and did so without an announcement that he would not receive future deliveries, and that, upon this state of affairs, plaintiffs were not justified in assuming that future deliveries would be refused.

Although the plaintiffs did in their letter make the failure of Sullivan to receive the logs within the time stated the test of their conclusion as to his unwillingness to go on with the contract, it cannot be fairly held that they meant by it than any acceptance of these logs, however inconsistent it might be with a recognition of the contract as continuing and unexecuted, which they had expressly claimed it to be in the same letter, would be regarded by them as an accession by him to their view that the contract was still unperformed and an assent by him to its being still obligatory on all parties. It is evident from this letter that the plaintiffs were not willing to even seem to assent to Sullivan's taking such time as he might deem necessary for the investigation suggested by him in his letter, and for the purpose of bringing the matter to an issue within a definite

period, they adopted the plan of making the demand in question. The demand was not intended, nor can it reasonably be given the effect, to deprive the plaintiffs of the right of taking advantage of any other act of Sullivan indicating a disavowal of the contract as continuing and unexecuted, even though the logs should be received by him. They are seeking an early and positive declaration from him on this point and the demand as to the logs was made in this view. An acceptance of the logs under and in the spirit of this demand, or without qualifying words, would doubtless have implied an assent to plaintiffs' view of the contract; but under the circumstances of this case, it is impossible to maintain that there has in fact been such an acceptance or assent. It is true the logs were accepted, but not in that sense or spirit which the demand for their acceptance called for, or made necessary, as an evidence of Sullivan's recognition of the contract as continuing; but on the contrary, the acceptance was made with a distinct assertion of a right to refuse to accept them, and an express declaration that in receiving them he did not waive the position, previously taken, that the contract had been fully executed.

Appellant's counsel also contends that this letter contains no announcement that Sullivan would not receive future deliveries. This makes it necessary to determine the meaning of Sullivan's, as indicated by the language with which the letter closes. When he says that he does not waive the position that the contract has been fully executed by plaintiffs and by D. F. Sullivan and his representatives, assumed by him in his letter of October 28th, it is not to be understood that he meant to except from that position anything which the conclusion finally announced in that letter is shown by the entire correspondence between them to have

comprehended. The letter of October 28th, or in a word, anything but the logs which were at the place of delivery as we have shown above, announced a conclusion which from previous correspondence could not fail to be understood as indicating to the plaintiffs that Sullivan would receive no more logs under the contract; this was practically what it meant and was intended to express. To hold the contrary is, to say the least, to ignore the patent purpose of the correspondence. The position he had assumed was in plain words that he would receive no more logs because, in his opinion, the contract had been fully performed by plaintiffs, and there was consequently no obligation on him to receive any more. Now, when more logs are tendered and a demand is made that he shall receive them, he does receive them, but accompanies the acceptance of them with an express declaration that he has the right to refuse them, and that he must not be understood as waiving his former position by doing so, which former position was that the contract had been fully performed.

Viewing the letter in connection with the preceding correspondence, our conclusion is that the meaning and purpose of Sullivan in accepting the logs was that he would recede from the position he had taken, and indicated by the former letter, to the extent of receiving the particular logs, but not further or otherwise, and that he would not receive any more logs under the contract. There is no other or greater abandonment of his previous position and the clearly and only justifiable or reasonable inference to be drawn by the plaintiff was that he would receive the logs, though he claimed he was not bound to do so, but would do nothing more in recognition of the contract as continuing or unexecuted.

JUNE TERM, 1890. 575

M. H. and E. S. Sullivan v. A. M. McMillan et al.—Opinion of Court.

In the preceding conclusion we have not omitted to consider that Sullivan, in his letter of October 20th, asserts that the contract in hand is business of the late house of D. F. Sullivan, of which he is surviving partner, and that he signs himself as such surviving partner, as he does in his subsequent letters, and that he is addressed as such in plaintiffs' letter of the 28th of that month. Counsel for appellants contend not only that this correspondence between plaintiffs and a surviving partner cannot be made the basis of a cause of action against the executors of a deceased partner, but also that the correspondence is written proof of the contract being one between the alleged house of D. F. Sullivan and plaintiffs, and with which the executors have, at least at law, no concern.

We shall dispose of the latter of these propositions first. Among the pleas interposed by the defendant is one to the effect, in so far as it need be given, that the contract sued on was entered into with plaintiffs by a copartnership doing business at and operating the Molino Mills, at Molino, under the name of Daniel F. Sullivan, and not otherwise, and that this partnership was composed of Matthew L. Davis and another copartnership doing business at Pensacola under the name D. F. Sullivan, and composed of said D. F. and M. H. Sullivan. To this plea there was a replication that the contract was not made with any such copartnership, and that there was no such copartnership, but that the contract was made with D. F. Sullivan as an individual; but the plea is shown, by an entry signed by the Circuit Judge, to have been withdrawn, and there being nothing in the pleadings to the contrary, the declaration stands admitted by the defendant to the extent that the contract is declared upon as the individual undertaking of the testator. The contract says nothing about any such partnership, but is

570 SUPREME COURT.

M. H. and E. S. Sullivan v. A. M. McMillan et al.—Opinion of Court.

upon its face the individual contract of D. F. Sullivan, and as such, and not otherwise, it is declared upon; and the defendant cannot, upon the pleadings before us, be heard to contend to the contrary. This disposes of one of the two propositions, and we will pass to the remaining one.

The other is, in effect, that if there has been a refusal to permit plaintiffs to carry out the contract, it was by Sullivan as surviving partner, and not by him as executor, and consequently there is no basis for an action against the defendants as executors, on account of a refusal of the kind indicated; that the correspondence furnishes no evidence that plaintiffs were prevented by any act of the executors from completing the contract.

In considering this proposition we shall not lose sight of the fact that the record fails altogether to show that their was any individual communication, either verbal or written, between the plaintiffs and Mrs. Sullivan, the executrix, upon the subject of the contract; it does not even appear that she either knew or saw any of the letters. The authorities all hold that co-executors, however numerous, are in the eyes of the law but one, or an individual person, and consequently the acts of any one of them, in respect to the administration of the effects are deemed to be the acts of all. Whatever is done by one in the scope of his duties is binding on all. Williams on Executors (6th ed.), 286, 1013-1015 and notes; American Law of Administration, 733-4; Schouler on Executors, Sec. 400; Bacon Abr., Executors and Administrators, (D), 1. Whatever was done by Sullivan is as binding on the executrix, as such, as it would be on him, as executor, if he were the sole executor. As we hold the correspondence to constitute a notice to the plaintiffs that no more logs would be received, the only question is, if the action of Sullivan in giving this notice, in the

manner that he did, would, were he sole executor, be binding on him as executor, or only as surviving partner. We think it would be binding on him as executor. Applied to as executor, he says he will answer in his capacity of surviving partner, as the matter inquired of is business of the late house of his testator, D. F. Sullivan, of which he is the surviving partner, and signs himself as such. He does not answer in a subsequent letter in this capacity and to the effect that he will receive no more logs. Prior to the receipt of this latter letter the plaintiffs address him in the capacity in which he has elected to reply to their former letter, and demand that he receive certain logs within a stated time. He, maintaining the capacity of such partner, writes in substance that he will receive the particular logs, but no more, and for the reason that the contract has been fully executed by plaintiffs and by D. F. Sullivan and his representatives. Now, when he is subsequently sued as executor, he tacitly admits that the contract was one entered into by his testator, and virtually confesses that his assumption that it was business of a house of which he was surviving partner is untenable against the action, and that the legal obligations under it had not survived to him as the living partner, but to the executor; still, he contends that, as he in fact answered in the capacity of surviving partner, his refusal is not binding upon him in his true capacity of executor, in which he should have applied. When he assumed in his first letter that the contract was the business of the alleged house and to answer in the capacity of surviving partner, he either meant that he would not perform it as executor, and that if he did perform it at all it would be in his character as surviving partner, or meant that he would answer in his capacity of surviving partner whether he would perform it as executor. If the latter, then he has

clearly announced that he would not carry it out as executor, and if the former, he, in effect, announced to the plaintiffs that he would not receive any more logs under it as executor, for the reason that it did not appertain to his duties as executor, but as surviving partner. It was under either view a refusal to perform the contract as executor. This refusal is involved in the one made expressly as a surviving partner, and based on the reason that the contract had already been performed by his testator and his representatives. So, applied to in both capacities, he has refused in each to perform the contract. What the reason given for either refusal was, is immaterial; there is the refusal, however insufficient or valid, assumed or real, the reason. To say now that there must be a second application to him as executor and a refusal as such, is to require of each side what there has in fact already been.

Concluding as we do that there has been an unequivocal refusal by the executors to receive any more logs under the contract, or what is termed an entire breach or renunciation of the contract, the question resulting is : the effect of such breach or renunciation as to the plaintiffs' right to sue. It has been held both in England and our own country that where one party, even before the time for performance of the contract has arrived renounces it to the other party, the latter may act on the renunciation, treat the contract as broken, and sue before the time for performance. Thus in Hochster vs. De la Tour, 2 E. & B. (75 E. C. L.), 678 ; 20 Eng. Law & Eq., 157, A. D, 1853, the contract was for the services of one of the parties as a courier for the other for a period of three months from a specified future day, June 1, 1852, at agreed monthly wages, and before the day for the commencement of the employment, the employer wrote the other party that he had changed his mind, and declined his

services. He refused to make any compensation and the other party sued him eight days before the day named in the contract for the commencement of the services. The jury found for the plaintiff, and it was held by the Court of Queen's Bench on motion in arrest of judgment that the plaintiff did not have to wait until after the time agreed on for the commencement of performance, but was entitled to sue upon the renunciation of the contract. Again, in Frost vs. Knight, L. R., 7 Exchequer Cases, 111, where the defendant promised to marry the plaintiff as soon as his, defendant's father, should die, and during his father's lifetime defendant refused absolutely to marry plaintiff, and plaintiff sued for breach of promise, the defendant's father being still alive, it was held by the Exchequer Chamber on appeal in 1872, reversing the decree of the Court of Exchequer, that there had been a breach of contract, upon which action would lie before the death of the defendant's father. The decision in Holloway vs. Griffith, 32 Iowa, 409, is in accord with the doctrine of Frost vs. Knight, *supra*, although decided before that case had been disposed of on appeal. In Fox vs. Kitton, 19 Ill., 519, it is held that a mortgagee was authorized to execute the powers given him by the mortgage upon the mortgagor's declaring that he would not comply with the terms of a subsequent agreement giving him an extension of time and looking to a satisfaction of the mortgage. Burtis vs. Thompson, 42 N. Y., 246; Crabtree vs. Messersmith, 19 Iowa, 179; Chamber of Commerce vs. Sollitt, 43 Ill., 519; Follansbee vs. Adams, 86 Ill., 13; Dugan vs. Anderson, 36 Md., 567; Grau vs. McVicker, 8 Biss., 13. In Daniels vs. Newton, 114 Mass., 530, decided in 1874, the decision is that an action for a breach of a written agreement to purchase land brought before the expiration of the time given for the pur-

chase cannot be maintained by proof of an absolute refusal on defendant's part ever to purchase. See also Nason vs. Holt, *Ibid*, 541. In Daniels vs. Newton the opinions in Hochster vs. De la Tour, and Frost vs. Knight, are ably reviewed by Wells, J., speaking for the court, and his views suggest with great force the necessity for careful consideration, (when the precise question shall be before us), whether a refusal by one party to perform, creates in the other party a right to sue before the time fixed by the contract for performance, as distinguished from such refusal having the effect merely to relieve the latter party from showing readiness and an offer to perform his part in order to make out a breach by the latter. Parsons on Contracts, Vol. 2, 809, bot. p., 7th ed.; Dingley vs. Oler, 117 U. S., 502-3; Roper vs. Johnson, L. R., 8 C. P. Cases, 167.

The case at bar does not, however, call for an expression of opinion as between the doctrine of Hochster vs. De la Tour, and that of Daniels vs. Newton. It rests upon another and unquestionable doctrine. The time for performance was on when the breach complained of was committed. The contract was entire and not severable in its character, and had been peformed in part at least, and upon a breach of the entire contract, it being committed by defendant while the plaintiff was ready and willing to perform, the latter became entitled to recover in one action the same damages as if he had fully performed his contract. Remelee vs. Hall, 31 Vt., 582, decides that the true criterion whether one in an action on a contract can recover damages for nonperformance of the whole contract, and thus recover damages not sustained at the time the action was brought, is whether there has been such a breach of the contract as the plaintiff is authorized to consider as entirely putting an end to the contract. In Parker vs. Russell, 133 Mass., 74, it

was held, without in any wise affecting the doctrine of
Daniels vs. Newton, *supra*, that if the breach of a contract
by one person to support another for his life is such that
the latter may treat the contract as absolutely broken, and
he so elects to treat it, he may recover damages for the
whole value of the contract, and not simply up to the date
of the writ.   In Lamoreax vs. Rolfe, 36 N. H., 33, where,
by the contract, the defendant was to draw certain timber
from a lot of land for the plaintiff, the decision was that the
breach of a contract to perform certain services within a
specified time is complete upon the arrival of the time to
commence the performance, and the absolute refusal to ever
fulfill the contract; and upon such a refusal a suit may be
instituted and damages recovered for the non-performance
of the whole contract.   The defendant contended unsuc-
cessfully that the recovery could only be for what he might
have done between the date of the agreement and the date
of the writ.   In Cort vs. Ambergate, etc., Ry., Co., 6 Eng.
Law & Eq., 230, the decision was that when there is an
executory contract for the manufacturing and supply of
goods from time to time, to be paid for after delivery, if the
purchaser, having accepted and paid for a portion of the
goods contracted for, gives notice to the vendor not to
manufacture any more, as he has no occasion for them, and
will not accept or pay for them, the vendor having been
desirous and able to complete the contract, he may, without
manufacturing and tendering the rest of the goods, main-
tain an action against the purchaser for breach of the con-
tract; and that in estimating the damages the jury were
justified in taking into calculation all the goods which
remained to be delivered and which the defendant had
refused to accept.   Howard vs. Daly, 61 N. Y., 362; Dugan
vs. Anderson, 36 Md., 567; Fish vs. Folley, 6 Hill, 54;

Schell vs. Plumb, 55 N. Y., 592; Ferris vs. Spooner, 102 N. Y., 10; Tinney vs. Ashley, 15 Pick., 546; Mullaly vs. Austin, 97 Mass., 30; Carpenter vs. Holcomb, 105 *Ibid*, 280; Amos vs. Oakley, 131 *Ibid*, 413; Smith vs. Lewis, 25 Conn., 624; Fales vs. Hemenway, 64 Me., 373; Sutherland vs. Wyer, 67 *Ibid*, 64; Jones vs. Barkley, 2 Doug., 684; Clossman vs. Lacosts, 28 Eng. Law & Eq., 140; Addison on Contracts, vol. 2, bot. pp. 469, 798–9, 830.

The defendant refused to allow plaintiffs to proceed with the contract, or to cut and deliver any more logs in accordance therewith, and on account of such refusal the plaintiffs were entitled to sue as for a breach of the entire contract and to recover the same damages as if they had fully performed it.

II. The third plea to the above breach is, that the plaintiffs after cutting logs over the whole of the land mentioned in the contract, did, in order to furnish logs thereunder, proceed to cut over large areas of land outside of those mentioned in the contract to enable them to make deliveries of logs in the quantities they were bound to deliver under the contract; and that the trees cut and converted into logs by plaintiffs outside of the contract limits, when added to the number of trees cut and converted into logs by the plaintiffs within the contract limits, exceeded the number of trees which at the time of the making of the contract stood within the contract limits, and were capable of being converted into logs of the dimensions and character specified in the contract; and that all the logs procured by the plaintiffs within and without the contract limits were delivered by the plaintiffs under said contract and constituted all the logs which the said D. F. Sullivan in his lifetime, or the defendants since his death, were bound to accept from the plaintiffs under such contract. Issue was taken on this plea.

Appellants contend that this plea is fully established by statements made in Sullivan's letter of October 28th and impliedly reiterated in that of October 31st, which letters were put in evidence by appellees. The statements are : " Having caused an examination of the territory within two miles of Hall's creek to be made, I find that you have not only cut over all the lands embraced in your log contract with D. F. Sullivan, but you have cut other lands not within the prescribed limits." Then, after the remark, in substance, that it is true there may be some scattering trees left within the contract limits, apparently large enough for logs, of which, as they were passed by in cutting, it may fairly be inferred that plaintiffs did not consider them proper material for the fulfillment of the contract, and " if then thus impliedly condemned" by plaintiffs, the writer can see no just reason for plaintiffs attempting to bring them under the contract, is the following : " Besides, the logs cut outside the two mile limit, which you had no right to deliver under the contract, are largely more than an offset for the refuse trees standing within the contract limit and in the midst of your cutting."

This letter was not, nor was the entire correspondence, introduced as showing admissions of defendants against their interests. In Insurance Company vs. Newton, 22 Wall., 32, cited by appellants' counsel, a witness, who was the agent of the plaintiff, testified that he delivered the written proofs to both the agent of the company and to its officers, and that no objection was made by either to their form or fullness, the agent of the company in fact saying that they were sufficient in form, but both objected that the entire proofs disclosed, as they in fact did, a case of suicide, and on that account payment was refused. The lower court allowed the statement of the company's officers and its

agent as to the sufficiency of the proofs of the death to be received as conclusive of the fact, but by its charge to the jury separated the admission of that fact from the accompanying language that the proofs disclosed a case of suicide, and held that this latter statement was of an independent fact to be established by the company. This ruling is thus disposed of by the Supreme Court: " Every admission is to be taken as an entirety of the fact which makes for the one side, with the qualifications which limit, modify or destroy its effect on the other side. This is a settled principle which has passed by its universality into an axiom of law. Here the admission related to the two particulars which the proofs established, the death of the insured and the manner of his death, both of which facts appear by the same documents. They showed the death of the insured only as they showed that he had committed suicide, and all that the officers evidently intended by their declaration was that they were satisfied with the proofs of the one fact because they established the other. The whole admission should therefore have been taken together. If it was sufficient to establish the death of the insured, it was also sufficient to show that the death was occasioned in such manner as to relieve the company from responsibility." The other citations of appellants hold that a party offering an admission must offer the whole of it. The whole admission is to be taken together to ascertain what the party making it has conceded against himself, yet it is for the jury to consider, under all the circumstances, how much of the whole statement they deem worthy of belief, including as well the facts asserted by the party in his own favor as those making against him. 2 Wharton's Law of Evidence, Sec. 1103 ; 1 Greenleaf on Evidence, Sec. 201.

There is, however, in these letters no admissions against

the interests of the defendants. The statements are assertions or declarations in the interests of defendants, and against that of the plaintiffs, and are inadmissible of *themselves*, as evidence of their truth in favor of the defendants. Smiths vs. Shoemaker, 17 Wall., 630. This letter, and in fact the whole correspondence, constitute the declaration of the defendants to the plaintiffs that the former would not receive any more logs under the contract, including their reason for not doing so; or, in other words, their refusal to perform the contract or to permit plaintiffs to perform it. It and nothing else is such refusal, and not merely evidence of it. To ascertain if there was such refusal the entire correspondence is to be considered. The doctrine of admissions against interest cannot be invoked to constitute these statements or assertions of the defendants, evidence of themselves against the plaintiffs, or in support of the plea under consideration. Declarations or statements made in the presence of a party are received in evidence, not as evidence in themselves, but to understand what reply the party to be affected by them, should make. If he is silent when he ought to have denied, the presumption of acquiescence arises. Wharton's Evidence, Sec. 1136; Gibney vs. Marchay, 34 N. Y., 305; Gebhart vs. Burkett, 57 Ind., 378; I Cowen & Hill, n. 191, 192. Certainly no view more favorable to the person making the statement can be held where it is made by letter, and not in the presence of the other person.

It is further contended, on behalf of defendants, that an acquiescence by plaintiffs in these statements and in the conclusion that the contract had been fulfilled is shown by the testimony. This acquiescence is claimed to be manifested not only by the absence of a word of objection, oral or written, "to the facts or the conclusions drawn from them,"

but moreover by the plaintiffs delivering no more logs under the contract, and disabling themselves by moving off their teams, which, according to the testimony of one of the plaintiffs, was done as soon as they received Sullivan's last letter.

The testimony shows that after plaintiffs had been notified to stop cutting logs under this contract, and had been told by Sullivan that he would take no more logs, as the mills had been burned down, they not only inquire of defendants if they could receive all logs which shall be in compliance with the contract, but plainly indicate by the expression " we shall only have short logs to cut and deliver," as well as by the general purport of the letter, a meaning and understanding that the contract was unfulfilled and that all logs deliverable under it had not been delivered. Sullivan's reply to this letter suggests, and for the first time, the idea that the contract may have been fulfilled and the necessity for an investigation upon this point and an assurance that it will be promptly made. This suggestion is met by the plaintiffs with a prompt repudiation and a positive assertion that the contract is in a large part unexecuted, and on the same day the defendant's letter containing the statements and conclusions claimed by them to have been acquiesced in is written. In the absence of testimony to the contrary a reasonable conclusion as to these letters of the 28th of October, is that neither is a reply to the other; an inconsistent conclusion is not reasonable. Neither one being an answer to the other, it cannot be claimed to be a tacit admission of anything said in the other and not replied to. Sullivan's letter of October 31st, does, however, make his of the 28th, a direct answer to plaintiff's of the 28th. There is, it is true, no reply by plaintiffs to either of these letters of Sullivan, yet we do not think the jury were wrong, in so

far as the testimony is concerned, in finding, notwithstanding the absence of any such reply, that there was no acquiescence by the plaintiffs in the "facts" and "conclusions" asserted by Sullivan's letter. To the "conclusions" announced by Sullivan's letter, that the contract had been fully performed by plaintiffs, the latter's letter of October 28th, to say nothing of the former one, is a positive "objection" and unqualified protest, no less positive in that it anticipates it upon the first suggestion of the possibility of such a conclusion being reached. That the reason for the conclusion, or, in other words, the statements made as supporting or justifying the conclusion are not subsequently denied, does not efface, nor does it deprive the plaintiffs of the benefit of their previous specific assertion that the contract was not executed, but on the contrary was still in large part unperformed; to which assertion Sullivan's last letter makes that written by him on October 28th, a direct reply, and presents as the status of the parties the plaintiffs applying for positive information from defendants as to whether they would permit a performance of the contract by plaintiffs, and asserting that the contract was in large part unexecuted, and the defendants as replying that they will not permit further performance because they consider the contract to have been fully performed for the reasons indicated. It was the right of the plaintiffs on receiving this reply, to treat the contract as renounced by the defendants and to sue for damages for an entire breach of it. No matter what reason was given by the defendants for refusing to permit a further performance, this right arose to the plaintiffs upon such refusal, if the contract was not fully executed and the plaintiffs were ready and willing to perform, and, without saying more now, we do not think that the failure of the plaintiffs to reply to these letters would,

39

under the circumstances of this case, have justified the jury in inferring acquiescence. The exercise of the right to treat the contract as entirely broken by the defendants, and to sue, relieved the plaintiffs from all further efforts at performance, and involved a cessation of all work under the contract; the treating of it as at an end. Quitting all performance was the only course consistent with the right they have chosen to exercise; and to impute to their moving off the teams, or not delivering any more logs, the effect or purpose of acquiescing in the assumption that the contract had been performed, is altogether inconsistent with the conduct of the plaintiffs throughout the period commencing with the letter of October 5th from Davis, notifying him to stop cutting "short logs:" during which period their unmistakable position has been that of persons claiming to have a contract still in part unperformed, and which they were ready and willing to perform.

The conclusion of the jury on this plea is claimed to be contrary, not only to the evidence, but also to the charge of the Court. In holding that the verdict is not contrary to the evidence, we mean the evidence as judged by the principles of law applicable to it, or, in other words, that the verdict is in accordance with law and the evidence. Where a charge is erroneous and the jury find contrary thereto, but in accordance with law and the evidence, and the trial judge on a motion for a new trial refuses to set the verdict aside, and enters judgment in accordance with the verdict, an appellate court should not disturb the judgment. To do so would be to perform the idle ceremony of requiring a new trial to obtain what has already been reached—a verdict and judgment according to the law and the evidence. In such a case the jury primarily and the judge ultimately, have merely disregarded an error previously committed by

the judge.  Where the error in the charge tends in favor of the losing party, he cannot say that he has suffered any disadvantage in law, or that the other side has gained any illegal advantage, by the error.  Central R. R. Co. vs. Smith, 74 Ga., 112; Peck vs. Land, 2 Ga., 1; Wellborn vs. Weaver, 17 Ga., 267; Winburn vs. Bryan, 73 N. C., 47; Armstrong's Administrator vs. Keith, 3 J. J. Marsh., 153; Van Vecter vs. Brewster, 9 Miss., 400; Campbell's Lesses vs. Sproat, 1 Yeates, 327; McLachlan vs. Wright, 3 Wend., 348; Clifton vs. Shannon, 4 Ind., 498; Roberts vs. Nodwift, 8 *Ibid*, 339; May & Sloan vs. Gamble, 14 Fla., 467. We are aware that a contrary rule obtains in Iowa, 10 Iowa, 548; 11 *Ibid*, 487; 14 *Ibid*, 289; 66 *Ibid*, 352, but must withhold our sanction from it as practice which sacrifices justice to form.

There are in the charge of the Judge three paragraphs which relate to the letters.  These paragraphs are as follows:

" In reference to the letters which are in evidence, the Court charges you that their entire contents are made evidence against the plaintiffs who put them in proof, but in construing them you are to regard their contents as admissions by the parties writing them, without regard to the party offering them in evidence.

" If there is a conflict between the contents of the letters and the parol evidence before you, the written evidence, that is the contents of the letters, are entitled to the most weight with you.  But it is your province to reconcile the evidence if you can; if you are unable to do so, then you will give the most weight to the written evidence.

" If there are any statements in the letters before you, written by defendants to plaintiffs, bearing upon the issue before you, that are against the plaintiffs' interest, and that

M. H. and E. S. Sullivan v. A. M. McMillan et al.—Opinion of Court.

are not replied to or denied by plaintiffs, they are to be considered as admitted by the plaintiffs."

Of the first paragraph it may be said that if there is anything in these letters which is evidence against the plaintiffs, then of course it was to be considered as such by the jury, but the fact of the plaintiffs putting them in evidence did not make anything evidence against plaintiffs that was not of itself so. Certainly their entire contents were not made evidence against the plaintiffs, and for the reason that there, to say the least, is much in them that is evidence in favor of the plaintiffs. Again, it is clear that there is in no one of these letters, considered in connection with the plea under consideration, any admission by the party writing it.

The second paragraph need not be noticed, but of the third it may properly be said there was, in one sense at least, no reply to or denial of the specific statement of "facts" made in Sullivan's letter of October 28th, and relied upon by defendants to sustain the plea under consideration. Though plaintiffs' letters controvert the position that the contract had been fully performed, there is no reply to Sullivan's letter just mentioned, and we are by no means prepared to say that the meaning of the Judge delivering the charge was not that the failure of the plaintiffs to answer or respond to the letter was an admission of the statement referred to. If such was his meaning, the verdict was contrary to the charge.

Assuming, as the defendants do and well may, that such was the Judge's meaning, our opinion nevertheless is that the charge was erroneous.

Admissions may be implied from acquiescence, (1 Greenleaf on Evidence, Sec. 197), but the authorities all hold that the acquiescence inferable from silence when words are spoken to a person's face, cannot be inferred from silence as

to a written communication. " What is said to a man be-
fore his face he is in some degree called upon to contra-
dict, if he does not acquiesce in it, but not answering a let-
ter is quite different, and it is too much to say that a man by
ommitting to answer a letter at all events, admits the truth
of the statements that letter contains." Fairlie vs. Denton,
3 Car. & P., 103. Silence, says the Supreme Court of
Massachussetts, (1 Cush., 215), may in the case of verbal
communications authorize the inference of an assent to
the statement made, but not equally so in the case
of a letter received but never answered or acted upon.
" So far as these letters might have been shown by
other proof to have been acted upon or sanctioned
by defendants, so far they would have been com-
petent evidence." See also Wharton's Law of Evidence,
1154; Dutton vs. Woodman, 9 Cush., 255 ; Higgins vs.
North Carolina R. R. Co., 7 Jones (Law), 470; St. Louis,
Alton & T. H. R. R. Co. vs. Thomas, 85 Ill., 464 ; Haynes
vs. Crutchfield, 7 Ala., 189 ; Fenno vs. Weston, 31 Vt.; 345.
Letters addressed to a person and found unanswered, in his
possession, are upon this principle held not to be *admisible*
against him as evidence of the statements made in them,
although where the same letters make a demand of pay-
ment they are admissible as evidence merely of the fact that
the demand has been made. The case of Gaskill vs. Skene,
14 Ad. & E. (68 E. C. L.), 664, permitted also an inference
as to the particulars of the demand stated in the letter, from
silence, but we are not prepared to say that this was not
a dangerous innovation upon the established rule.

What is said in the preceding paragraph is not meant as
applicable to cases in which there has been an exchange of
letters, or a correspondence, between the parties. In Fenno
vs. Weston, *supra*, there was such a mutual correspondence,

and the doctrine of the case is set forth in the following extract from the opinion : "The omission of the party to reply to statements in a letter about which he has knowledge, and which, if not true, he would naturally deny, when he replies to other parts of the letter, is evidence tending to show that the statements so made and not denied are true. So where there has been a correspondence between parties in regard to some subject-matter, and one of the parties writes a letter to the other making statements in regard to such subject-matter, of which the latter has knowledge, and which he would naturally deny if not true, and he wholly omits to answer such letter, such silence is admissible as evidence tending to show the statements to be true. Still, all such evidence is of a lighter character than silence when the same facts are directly stated to the party. * * * Where the party replies to the letter, but says nothing upon points which he would naturally contradict if untrue, as in this in Weston's reply to Fenno's first letter, the silence furnishes stronger proof of acquiescence in the alleged facts than the subsequent entire omission to reply. * * * A case of a bare naked claim by letter (instancing Fairlie vs. Denton, *supra*), without being accompanied by any correspondence between the parties, is clearly distinguishable from the case at bar."

It will be observed that the Vermont court does not hold the omission of the defendant to answer certain statements, or his failure to reply to the subsequent letters of the plaintiff to constitute in itself an admission of the unanswered statements of the first letter, or of the statements of the subsequent letters, but simply that such silence was admissible as evidence "tending" to show that the statements made were true. The facts of the case are important to a correct appreciation of the ruling. Plaintiff on September

20, 1854, wrote defendant, stating that the mare, to which the suit related, had ringbones, and was unsound, that the plaintiff bought her of the defendant upon the latter's warranty of her soundness, and requesting the defendant to take the mare and pay back the plaintiff's money, or pay fifty dollars for breach of warranty, the plaintiff retaining the mare. Seven days after the date of this letter, defendant replied that the mare had not ringbones, stating his reasons for saying she had not, and also saying that he did not consider himself responsible for the mare's safe arrival at plaintiff's residence. Plaintiff also wrote defendant three other letters, dated respectively September 29th, October 29th, of the same year, and September 10, 1856, which letters were of a similar tenor to that of September 20th. Defendant made no reply to either of them. There was also oral evidence in behalf of plaintiff, tending to prove the purchase of the mare by plaintiff from defendant, and the payment for her by the latter, and the warranty of her soundness by defendant. So then, the decision is in effect no more than that the silence of the defendant as to the unanswered statements was under the circumstances evidence to be considered, in connection with the other testimony, and as tending to show that the unanswered statements were true. In the case before us there is no testimony outside of the letters tending to show that the statements of Sullivan's letter of October 28th were true, and we are entirely satisfied it was altogether erroneous to declare as a proposition of law that the failure to reply to this letter, and that following it, was an admission by plaintiffs of the statements. We have already declared our conclusion as to the weight of the evidence as showing an acquiescence by plaintiffs in the statements.

III. One of the provisions of the contract is an agree-

ment by the plaintiffs to deliver one hundred logs daily if so required by the other party thereto. The Judge charged the jury, that if they were satisfied from the evidence that the defendants prevented the plaintiffs from completing the contract, and that at the time they were so prevented, there remained trees on the lands covered by the contract which would have enabled plaintiffs, if not so prevented, to furnish an additional quantity of logs according to the provisions of the contract to the extent of one hundred logs per day, if required by defendants to furnish that quantity daily, there was a breach of the contract by defendants for which plaintiffs were entitled to recover such damages as the evidence may show they sustained.

The assignment of error is, that the verdict of the jury was contrary to the charge of the Court, in that the jury fixed the amount of profits deducible from the conversion into logs of the remaining trees within the contract area, and the delivery of the logs under the contract without regard to the plaintiffs' obligation to deliver one hundred logs per day if required.

The contention of the appellants is, in short, that the evidence does not show at what cost the logs remaining on the land and answering the specifications of the contract could have been delivered at the rate of one hundred logs per day.

The contract was entered into, according to the date it bears, on the 24th day of August, 1882, and by its terms was to take effect "on and after" the 22d day of the following October. Wiggins testifies that the plaintiffs entered upon the performance of it about the day of making it, by cutting and hauling logs and fixing ditch ; that they worked under contract "two years"; were idle in October and November, 1884, being first notified to stop getting logs by

Davis' letter of October 5th of that year, given in a former part of this opinion. It is nowhere stated in the testimony whether or not Sullivan had before terminating the contract required plaintiffs to deliver one hundred logs daily, but taking the time Wiggins says they had worked under the contract, and the quantity of logs actually delivered under it, 70,200, it is evident that an average of one hundred logs per day, excepting of course Sundays, had been delivered up to the time they ceased delivering. It was doubtless upon this assumption that the Circuit Judge gave the above instruction, for in a case of this kind, when the action is brought before the expiration of the time required for a full performance, the damages are to be estimated upon the basis of the circumstances existing at the breach.

In Masterton vs. The Mayor of Brooklyn, 7 Hill, 61 ; where the contract, one requiring several years for performance, was to furnish and deliver marble of a certain kind for the construction of a public building, and the action was brought before the time for full performance had expired, but the trial took place afterwards, it was held not only that the measure of damages as to so much of the contract as remained unperformed at the breach was the difference between what the performance would have cost and the contract price, or, as expressed in Brent Brothers vs. Parker, 23 Fla., 200, the profits which the party contracting to do the work would have made if he had completed the contract; but also that in estimating what the performance of the contract would have cost, the court and jury should be governed by the price of labor and materials at the time of the breach, paying no attention to subsequent fluctuations in the market.

It was urged in the case referred to, that inasmuch as, the furnishing the marble would have required five years, of

which only about a year and a half had expired at the time of the breach, the benefits which the party plaintiffs might have realized from the execution of the contract, which we may here say was not one specifying any particular time for its completion, must necessarily be speculative and conjectural, the court and jury having no certain data upon which to make estimates. To this the Court replied: That if it were necessary to make the estimate on any such basis the argument would be decisive of the claim, but that no such necessity existed; that where the contract was broken by one party before the arrival of the time for full performance and the other party elects to consider it in that light, the market price on the day of the breach is to govern in the assessment of damages; the damages are to be settled and ascertained according to the existing state of the market at the time the cause of action arose, and not at the time fixed for full performance; and that the basis upon which to estimate the damage is just as fixed and easily ascertained in cases like the present as in actions predicted upon a failure to perform at the day. As to proof of damages it is said in the same case: As there is no market value of the article which plaintiffs had agreed to furnish, "the parties will have to go into an inquiry as to the actual cost of furnishing the article at the place of delivery; and the court and jury should see that in estimating this amount, it be made upon a substantial basis, and not left to rest upon the loose and speculative opinion of witnesses. The constituent elements of the cost should be ascertained from sound and reliable sources; from practical men having experience in the particular department of labor to which the contract relates. * * * A jury should scrutinize with care and watchfulness any speculative or conjectural account of the cost of furnishing the

article, that would result in a very unequal bargain between the parties, by which the gains and benefits, or, in other words, the measure of damages against the defendants are unreasonably enhanced. They should not overlook the risks and contingencies which are almost inseparable from the execution of the contracts like the one in question, and which increase the expense independently of the outlays in labor and capital. * * *" In United States vs. Speed, 8 Wall., 77, it is said, affirming Masterson vs. Mayor, *supra*, the measure of damages is the difference between the cost of doing the work and the price agreed to be paid for it, making reasonable deductions for the less time engaged, and from release from the care, trouble, risk and responsibility, attending its full execution. In N. & H. R. Co., vs. Story, 6 Barbour, 419; S. C., 6 N. Y., (2 Selden), 85, it was again held that the market price or fair value on the day of the breach is to govern, and the damages are to be settled and ascertained according to the existing state of the market at the time the cause of action arose, and not by the market price of labor and materials at the time fixed for full performance.

In Morrison *et al.*, vs. Lovejoy, 6 Minn., 319; there was a contract for the manufacture of lumber at certain mills during a given term at a specified price per thousand feet, one party agreeing to furnish logs to the full capacity of the mills during the period covered by the contract, and the other party agreeing to employ the mills during such period exclusively for the party furnishing the logs. Before the expiration of the term of the contract, the party who was to furnish the logs refused to proceed further under the contract, and in an action brought by the other party, it was held that he might treat the contract as terminated, sue at once for the damage sustained by the breach, and

that his damages would be measured by the value of the contract to him at the breach, and that this value depended upon the profits which he would have realized from it, had it been performed during the term, and that in estimating such profits the rent or value of the use of the mills and necessary machinery should be taken into account as a part of the cost of manufacturing.    Town of Royalton vs. Royalton & Woodstock Turnpike Co., 14 Vt., 311 ; Allen vs. Thrall, 36 *Ibid*, 711 ; Grand Rapids & B. C. R. R. Co., vs. Van Dusen, 29 Mich.,'431 ; George vs. Cahawba & Marion R. R. Co., 8 Ala., 234 ; Friedlander vs. Pugh, Slocumb & Co., 43 Miss., 111 ; Thompson vs. Jackson, Owsley & Co., 14 B. Mon., 114; Philadelphia, W. & B. R. R. Co. vs. Howard, 13 How., 307 ; Durkee vs. Mott, 8 Barbour, 423. . The profits which may be recovered are those which are the direct and immediate fruits of the contract; and in estimating them allowance should be made for every item of cost and expense necessarily attending a full performance. 2 Sutherland on Damages, 522 ; 6 Minn., 354, and authorities, *supra*.

The testimony in behalf of plaintiffs upon the cost of the performance of the remainder of the contract is, assuming that the amendment of the bill of exceptions after the expiration of the additional time allowed by the special order for presenting the bill, was permissible, (a point upon which we intimate no opinion), as follows :  " The logs fulfilling the contract remaining on the land could have been delivered under and in accordance with the contract for less than 3½ cents per cubic foot.    Thus, $1.50 daily for feeding teams, one team would haul daily eight logs, driver $1.25, sawing logs, cutting down and cutting up, 10 cents per log. Ten cents to run logs down ditch, and bring back coupling; 2½ cents for inspection.    I calculate rainy days, because in

JUNE TERM, 1890. 599

M. H. and E. S. Sullivan v. A. M. McMillan et al.—Opinion of Court.

dry weather I could haul more than eight logs. The average distance being one and a half miles, could easily haul ten logs. If the ditch was as I left it, I would take contract to deliver logs at 5 cents per cubic foot. I have never found it practicable to cut all logs on land, because could not get about with team. I have delivered off the territory 70,000 logs, think 70,200 logs. In cutting ditch in these places you need large territory. In cutting logs, if you cut all logs, it makes so much brush you cannot get about with teams, and it is the custom of all log men to cut over land several times." Godwin, a witness for plaintiffs, says he was logging for them when they were stopped, was paid by log, could make a living in getting logs down to dam at "3 cents foot;" that it would have been as cheap to deliver the logs left standing as those that were hauled away ; that he told some one that Wiggins paid him "4 cents foot ; made a good deal of profit ; this was for bill logs which he was cutting at the time." Collins, another witness for plaintiffs, says it was his "custom to cut part and leave part, leaving some and going back over it again."

When we consider that the subject of inquiry was the cost of delivering logs, numbering, according to the assertions of plaintiffs' witnesses, as high as 62,400, (for neither of them puts the quantity remaining on the land and answering the requirements of the contract, at less than four logs to the acre, and the number of acres of the land is given as 15,600), at the rate of one hundred logs per day, and that to deliver them at this rate, excluding Sundays, would have required a period of nearly two years, we cannot feel satisfied that Mr. Wiggins understood that he was speaking to the real proposition involved. The absence from his statement, of the number of "teams" it would have been necessary to keep on hand and employ to insure their

delivery of so many logs daily during so long a period, is to our minds strong evidence in itself that he did not understand that he was speaking to such a proposition, but whether he did or did not so understand, we do not think his testimony was sufficient to justify a verdict upon the basis of the delivery of one hundred, or any other number, per day, for when he proceeds to itemize the expenses of delivering, he admits certain elements of expense, which, in view of the items he mentions, suggests themselves, and independent of which no verdict approximating justice can be rendered. Had the contract been performed in full, the value of the use of the teams required for performance would have been an element of expense; when he ceased to perform, his expense ceased; his teams then became free to · be used in any other venture, and were no longer employed in this; or if he had been hiring them from other persons, the cost of their use would have ceased. It cannot be that the plaintiffs are to be better off than they would have been if they had performed the contract; yet if the value of the use of, or the cost of hiring the oxen which would have been employed in the performance of the contract is not included as an expense, it is certain that less expense is estimated, and consequently greater profit allowed than would have been in case of actual performance. This item of expense, and we do not say there are not others of the same kind, is necessarily shown by the fact that teams are proved to have been used in the performance of the contract. It is of course to be distinguished from any item of expense which those given do not suggest as necessarily attending the performance of the contract. It is a patent defect in the testimony of the witness, and destroys it as the basis of a just or legal verdict, whatever the number of logs to be

delivered daily was; and of course the assumption that some certain number of logs would be delivered daily is indispensable to fixing upon the time it would have taken to perform the balance of the contract, and without such assumption of time there can be no ascertainment of the cost of feeding the oxen, and others that will suggest themselves, and of course no verdict of any better character than a mere speculation.

The testimony of other witnesses for plaintiffs would certainly not sustain any verdict of damages as to the unperformed part of the contract, and that for the defendant does not. There must be a new trial.

IV. As to the alleged breach that defendant refused to appoint an inspector to inspect logs cut by plaintiffs and delivered at the place specified, it is unneccessary for us to say anything in view of our conclusion as to the breach already discussed; and as to which is advanced by appellants in regard to the breach: "that defendants refused to pay for certain logs cut, delivered and inspected, in accordance with the contract," the admission shown by the bill of exceptions and the charge of the Judge to have been made that the amount claimed for logs actually delivered was actually due, is good ground for silence on our part.

This disposes of all the points raised.

The judgment will be reversed and the cause remanded for a new trial.