WALLACE, Judge.
Upon consideration of the Appellants’ motion for rehearing and for issuance of a written opinion filed December 27, 2011, it is
ORDERED that the Appellants’ motion is granted in part and denied in part. This court’s opinion dated December 9, 2011, is withdrawn, and the attached opinion is substituted therefor. In all other respects, Appellants’ motion is denied.
Lance Smith and Thomas Allen, as Co-Personal Representatives of the Estate of Scott P. Smith, deceased, appeal the probate court’s order denying their first amended petition to establish and to probate a lost or destroyed first codicil to the decedent’s last will and testament. Although the Co-Personal Representatives produced a copy of the alleged lost codicil, they failed to prove its content by the testimony of at least one disinterested witness as required by section 733.207, Florida Statutes (2010). Accordingly, we affirm the probate court’s order.[1]
I. INTRODUCTION
The decedent, Scott P. Smith, owned two fox red Labrador Retriever dogs. The subject of the lost codicil was a bequest of $40,000 to establish a pet trust for the health, care, and welfare of the dogs. The initial trustee of the pet trust was Lance Smith, who was also one of the Co-Personal Representatives. When the Co-Personal Representatives filed their initial petition to establish the lost codicil, Lance Smith had already transferred $40,000 of the estate’s money to fund the pet trust and had assumed the care, custody, and control of the dogs.
*1231 Scott D. Smith, III, a minor, is the decedent’s grandson and a beneficiary. Astrid DeParry is the guardian ad litem (the GAL) for the minor. The GAL contested the Co-Personal Representatives’ petition to establish the lost codicil on behalf of the minor beneficiary.
II. THE FACTS
In their first amended petition, the Co-Personal Representatives sought, under section 733.207, to establish the decedent’s lost codicil dated October 24, 2007. The probate court held an evidentiary hearing and made detailed findings in its written order. The probate court noted that Mr. Allen was a longtime attorney for the decedent. On October 19, 2007, Mr. Allen traveled from his office in Orlando to the decedent’s residence in St. Petersburg where the last will and testament was formally executed. At that time, the decedent, at the age of 77, was in failing health. Simultaneously with the presentation of the will, and for reasons that were unclear, Mr. Allen presented to the decedent the first codicil to the will. The codicil established a $40,000 trust fund through which Lance Smith, the other Co-Personal Representative, would care for the decedent’s dogs. Upon presentation of the codicil to the decedent, Mr. Allen learned that a dog’s name had been misspelled. Thus Mr. Allen returned to his office, corrected the codicil, and then went back to the decedent’s home on October 24,2007.
Both Co-Personal Representatives testified at length about their recollection of the decedent’s execution of the codicil on October 24. Lance Smith advised the probate court that he negotiated the $40,000 figure ultimately included in the pet trust. And although Lance Smith initially sought $60,000 for the trust, he and the decedent reached a compromise on the $40,000 amount. According to the probate court, both Co-Personal Representatives demonstrated a clear and consistent recollection of the day’s events.
Following execution of the codicil, Mr. Allen retained possession of it and returned to his office in Orlando. There the document was misplaced, and it has never been found. The decedent eventually passed away on March 30, 2008.
The probate court made the following additional findings in its order:
Following [the] Decedent’s death, the Co-Personal Representatives filed a Petition for Administration of this estate on April 7, 2008. Although Paragraph 8 of that Petition disclosed the existence of the October 19, 2007 Will, neither Petitioner, under penalties of perjury, disclosed the existence of the Codicil. It’s difficult to understand why two competent, professional individuals, both with clear recollection of the signing of the Codicil, failed to remember the existence of a Codicil at the time they filed the Petition. That is particularly true where the Codicil had the effect of establishing a $40,000 trust fund through which one of the Co-Personal Representatives would pay for the upkeep of two dogs. On April 14, 2008, Letters of Administration were issued and the estate administration commenced. Approximately three (3) months after the Decedent’s death, Mr. Allen testified that he realized the Codicil was missing. He promptly notified his Co-Personal Representative. The following January 23, 2009, without having locat[ed] the missing Codicil, Mr. Smith, as Co-Personal Representative^] transferred $40,000 to himself as Trustee of a trust purportedly established by the missing Codicil. In June of 2009, a Federal Estate Tax Return Form 706 was filed reflecting the $40,000 transfer of funds. More than a year later without having *1232 located the missing Codicil, on July 12, 2010, the Petitioners filed the original request to Establish the Lost Codicil. No reason was given for the delay in advising the Court that a Codicil existed or that it had been lost in Mr. Allen’s office. Containing incorrect allegations as to the identity of the witnesses, it was necessary to amend the Petition, which is before the Court today.
The probate court noted that the Co-Personal Representatives offered into evidence unsigned copies of the first codicil to support their amended petition. In addition, they offered their own testimony; the testimony of Deborah Stegmeier, an employee of Mr. Allen; and the deposition testimony of Jennifer Torres, who had witnessed the decedent’s execution of the codicil that was later lost or destroyed.
III. THE APPLICABLE LAW
Section 733.207 outlines the procedure for establishing a lost or destroyed will:
Any interested person may establish the full and precise terms of a lost or destroyed will and offer the will for probate. The specific content of the will must be proved by the testimony of two disinterested witnesses, or, if a correct copy is provided, it shall be proved by one disinterested witness.
The term “will,” as used in the statute, includes a codicil. See § 731.201(40), Fla. Stat. (2010); see also Fla. Prob. R. 5.510 (stating additional requirements for the establishment and probate of a lost or destroyed will). Under the statute, the testimony of one disinterested witness is sufficient to prove the content of the lost will or codicil if the proponent can produce a “correct copy” of the instrument. Douglass v. Frazier (In re Estate of Musil), 965 So.2d 1157, 1159 (Fla. 2d DCA 2007); Bury v. DiLegge (In re Estate of Kero), 591 So.2d 675, 676-77 (Fla. 4th DCA 1992). In the absence of a correct copy, the testimony of two disinterested witnesses is required to prove the content of the lost will or codicil. Tartaglia v. Hatten (In re Estate of Hatten), 880 So.2d 1271, 1275 (Fla. 3d DCA 2004).
In the Estate of Parker litigation, the Fourth District Court of Appeal held that a preliminary, handwritten draft of a typewritten original of a lost will qualified as a correct copy under the statute. In re Estate of Parker (Parker I), 369 So.2d 1034, 1035-37 (Fla. 4th DCA 1979). On review by certiorari, the Supreme Court of Florida rejected the proposition that such a preliminary draft could qualify as a correct copy under the statute. In re Estate of Parker (Parker II), 382 So.2d 652 (Fla.1980). The court held that a preliminary draft is not a “correct copy” within the meaning of the statute for two reasons. First, “[i]t is not a ‘copy’ because a draft is not a double or a true transcript of an original writing.” Id. at 653-54. Second, “[i]t is not ‘correct’ because it is not the approved or conventional way of making a copy of an original writing.” Id. at 654.
In the Parker II case, the supreme court construed the statutory term “correct copy” as follows:
The word “copy,” then, means a double of an original instrument, such as a carbon or photostatic copy. The word “correct” modifies and qualifies the word “copy.” It strengthens the already strong word “copy.” We therefore conclude that the words “correct copy” means a copy conforming to an approved or conventional standard and that this requires an identical copy such as a carbon or photostatic copy.
Id. at 653. A copy need not be conformed to qualify as a correct copy under the statute. In other words, there is no requirement that the copy bear the signature *1233 of the testator or the signatures of the witnesses. Carlton v. Sims (In re Estate of Carlton), 276 So.2d 832, 833 (Fla.1973); Stewart v. Johnson, 142 Fla. 425, 194 So. 869, 872 (1940); Brittingham v. Jarvis (In re Estate of Maynard), 253 So.2d 923, 924 (Fla. 2d DCA 1971); Bury, 591 So.2d at 676-77.
III. THE PROBATE COURT’S RULINGS
The probate court made two key rulings that the Co-Personal Representatives challenge on appeal. First, the probate court ruled that the copy of the codicil generated from Mr. Allen’s office computer did not qualify as a correct copy under the statute.[2] Relying on the supreme court’s decision in Parker II, the probate court reasoned that the computer-generated copy of the missing codicil was a draft that did not qualify as a correct copy. Second, the probate court ruled that the testimony of the Co-Personal Representatives could not be used to prove the specific content of the codicil because they were not disinterested witnesses. The probate court concluded that the Co-Personal Representatives could not qualify as disinterested witnesses because the personal representative of an estate is specifically deemed to be an “interested person” under section 731.201(23).
We disagree with both of the probate court’s rulings. However, under the “tipsy coachman” doctrine, we are bound to affirm the probate court’s order if it reached the correct result, even if it reached that result for the wrong reason. See Dade Cnty. Sch. Bd. v. Radio Station WQBA, 731 So.2d 638, 644-45 (Fla.1999); Johnson v. Allstate Ins. Co., 961 So.2d 1113, 1115 (Fla. 2d DCA 2007). In this case, we find an alternative basis for affirmance in the record. To explain our decision to affirm, we will examine each of the probate court’s rulings separately.
IV. THE COMPUTER COPY OF THE CODICIL
The Co-Personal Representatives proffered at the final hearing a copy of the codicil that they generated from the hard drive of the computer in Mr. Allen’s office that was used to prepare the original document. The probate court ruled that the computer copy was a “draft” that did not qualify as a “correct copy” within the meaning of section 733.207. Tracking the language of the supreme court’s decision in Parker II, the probate court stated that “ ‘[c]orrect cop/ means a copy conforming to an approved or conventional standard [and] this requires an identical copy such as a carbon or photo static copy.”
For three reasons, we think the probate court misread the supreme court’s holding in Parker II. First, in the Parker litigation, the “copy” of the alleged lost will produced for probate was a handwritten, preliminary draft of a later typewritten version of the original lost will. Parker II, 382 So.2d at 653; Parker I, 369 So.2d at 1035. In other words, the draft at issue in the Parker litigation differed substantially from the lost original will. Here, there was testimony from Deborah Stegmeier, Mr. Allen’s office assistant, that the content of the computer copy of the codicil was identical to the document she prepared for the decedent’s approval and signature. Thus the computer copy of the *1234 codicil was not a preliminary draft of the sort disapproved by the supreme court in Parker II.
Second, the probate court misconstrued the portion of the supreme court’s holding in Parker II referring to the requirement of “an identical copy such as a carbon or photostatic copy.” 382 So.2d at 653. Both the probate court and the GAL read this language as exclusive. In their view, the only type of copy that can be used to prove the content of a lost will or codicil under the statute is a carbon copy or a photocopy. Such an interpretation would preclude the use of a computer-generated copy. However, the supreme court’s language in Parker II is not so restrictive. In the court’s reference to “an identical copy such as a carbon or photostatic copy,” the carbon copy and the photostatic copy are merely examples of identical copies. See The American Heritage Dictionary of the English Language 1729 (4th ed. 2000) (defining the idiom, “such as” to mean “[f]or example”). However, the carbon copy and the photocopy are not the only kind of copy that can qualify as an identical copy of an original document. Unquestionably, a copy of a document generated on a computer can be identical to — and indistinguishable from — the original.
Third, the supreme court decided the Parker II case in 1980. Although some personal computers were sold in the late 1970s, the personal computer did not come into general use in law offices and other businesses until the 1980s, after Parker II was decided.[3] We do not think that the supreme court’s reference in 1980 to carbon copies and photostatic copies as examples of “an identical copy” was intended to limit for all time the types of copies that could be used to establish the contents of a lost instrument, regardless of future technological developments. Indeed, the legal profession in Florida is now reported to be on the brink of a transition to the paperless office and the paperless courthouse. See Gary Blankenship, E-filing’s Time is Now, Fla. B. News, Jan. 15, 2012, at 1; Gary Blankenship, E-filing’s Proponents: Get Ready, It’s Coming, Fla. B. News, Dec. 1, 2011, at 1. As we face this transition, it would be an anachronism to adopt a rule that a copy of a lost will or codicil retrieved from the hard drive of a computer or from a cloud database[4] cannot be a “correct copy” within the meaning of section 733.207.
Nevertheless, the GAL argues that a “correct copy” can only be a carbon copy or a photocopy because “[a]ny other form of copy could have been or could easily be altered.” She points to the ease with which people can alter and manipulate documents on computers. We concede that people can readily alter documents on computers. But people can also alter carbon copies and photocopies. See generally 23 Am. Jur. POF 3d 621 § 22 (1993) (discussing various methods used to alter or manipulate photocopies); 20 Am. Jur. POF 265 §§ 27-30 (1968) (discussing the analysis of carbon paper and carbon copies to *1235 detect alterations). The possibility that an unscrupulous few may misuse a particular form of technology is not a reason to reject that technology entirely. Here, there was no evidence that anyone had altered the computer copy proffered as the copy of the codicil. It does not appear from our record that the GAL undertook to examine Mr. Allen’s computer to determine if the computer copy of the codicil had been altered. For these reasons, we find the GAL’s argument to be unpersuasive.
Thus, for the reasons discussed above, we conclude that the probate court erred in ruling that “the Co-Personal Representatives have failed to produce a ‘correct copy’ of the lost Codicil.”
Y. INTERESTED PERSONS AND DISINTERESTED WITNESSES
The general definitions section of the Florida Probate Code defines the term “interested person,” in pertinent part, as follows:
“Interested person” means any person who may reasonably be expected to be affected by the outcome of the particular proceeding involved. In any proceeding affecting the estate or the rights of a beneficiary in the estate, the personal representative of the estate shall be deemed to be an interested person.
§ 731.201(23) (emphasis added). The probate court concluded that the Co-Personal Representatives could not qualify as “disinterested witnesses” under section 733.207 because each of them was deemed an “interested person” under the Probate Code. Once again, we disagree.
There is a significant distinction between the concept of an “interested person” under section 731.201(23) and the concept of “disinterested witnesses” as used in section 733.207. Under the Probate Code, the term “interested person” refers to a person’s or entity’s standing, i.e., the right to notice and an opportunity to be heard in a particular proceeding pending in a probate or guardianship matter. See Hayes v. Guardianship of Thompson, 952 So.2d 498, 507-08 (Fla.2006).
On the other hand, a person may be described as “disinterested” when he or she is “[f]ree from bias, prejudice, or partiality; not having a pecuniary interest.” Black’s Law Dictionary 536 (9th ed. 2009). It follows that a “disinterested witness”— as the term is used in section 733.207— refers to a person “who has no private interest in the matter at issue.” Black’s Law Dictionary 1740 (9th ed. 2009). To put it differently, a “disinterested witness” has no stake in the outcome of the matter in which he or she offers evidence. See The American Heritage Dictionary of the English Language 519, usage note (4th ed. 2000) (“In traditional usage, disinterested can only mean ‘having no stake in an outcome,’ .... ”). The probate court’s ruling erroneously assumed that an “interested person” under the Probate Code could not simultaneously be a “disinterested witness.”
The personal representative of an estate is an interested person in virtually every proceeding affecting the administration of an estate. Describing the personal representative as an interested person is another way of saying that he or she is entitled to notice and an opportunity to be heard before the matter under consideration is determined. A personal representative can be an interested person in a proceeding while remaining disinterested in the result of the proceeding. For example, a personal representative may have no private interest in the result of a proceeding to determine the entitlement of a surviving spouse to the elective share conducted in accordance *1236 with Florida Probate Rule 5.360(c). In that sense, the personal representative is disinterested. However, the personal representative would be an interested person entitled to notice of the proceeding and opportunity to be heard. Thus the personal representative can be an interested person but still participate in a proceeding as a disinterested witness. In reaching its ruling in this case, the probate coui't overlooked this significant distinction.
Nevertheless, the probate court reached the correct result in the matter before it. Although the Co-Personal Representatives were not legally disqualified from establishing the content of the lost codicil by virtue of their fiduciary roles, they were disqualified because they were both interested in fact. Mr. Smith and Mr. Allen each had a substantial private interest in the outcome of the proceeding to establish the lost codicil.
When questioned at oral argument, counsel for the Co-Personal Representatives did not contend that Mr. Smith qualified as a disinterested witness. Undeniably, he stood to gain or lose as a direct result of the probate court’s ruling on the petition to establish the lost codicil. Instead, counsel argued that Mr. Allen qualified as a disinterested witness. We disagree. Mr. Allen also had a direct stake in the outcome of the petition to establish the lost codicil.
Mr. Allen’s personal interest in the outcome derives from at least two factors. First, Mr. Allen was directly responsible for the loss or destruction of the codicil from which Mr. Smith was to benefit. An adverse ruling on the petition might result in a claim by Mr. Smith against Mr. Allen for damages. See Hare v. Miller, Canfield, Paddock & Stone, 743 So.2d 551, 553 (Fla. 4th DCA 1999) (“Intended third-party beneficiaries of testamentary documents are found to have standing in legal malpractice cases if they are able to show ‘that the testator’s intent as expressed in the will is frustrated by the negligence of the testator’s attorney.’ ”); Benedict v. Smith, 34 Conn.Supp. 63, 376 A.2d 774, 775 (Conn.Super.Ct.1977) (discussing an action brought by beneficiaries under a lost will against an attorney for alleged negligence in failing to produce the will or a copy of the will after the decedent’s death). Second, if Mr. Smith failed to return the $40,000 to the estate with interest, the beneficiaries might make a claim against Mr. Allen, as Co-Personal Representative, predicated on the default of his fellow fiduciary. See Eastman Co. v. Anyon, 116 Fla. 137, 156 So. 302, 303 (Fla.1934) (stating that the acts of one co-executor in the course of the administration of an estate within the scope of his duties are usually deemed binding on all co-executors) (citing Sullivan v. McMillan, 26 Fla. 543, 8 So. 450 (1890)). But cf. § 733.619(2) (“A personal representative is individually liable for obligations arising from ownership or control of the estate or for torts committed in the course of administration of the estate only if personally at fault.”). Thus Mr. Allen, like Mr. Smith, did not qualify as a disinterested witness because of his direct stake in the outcome of the pending proceeding.[5]
The remaining witnesses were unable to prove the content of the lost codicil as required by section 733.207. Deborah Stegmeier, Mr. Allen’s office assistant, prepared the codicil, as well as several *1237 other documents for execution by the decedent, on her computer in Mr. Allen’s Orlando office. However, Ms. Stegmeier did not accompany Mr. Allen to St. Petersburg for the execution of the codicil. She remained behind at his Orlando office. Thus, as the probate court observed, Ms. Stegmeier did “not have firsthand knowledge of what document may or may not have been presented to the [d]ecedent for his signature.” Instead, Ms. Stegmeier’s knowledge was limited to the documents prepared on her computer.
Jennifer Torres was one of the witnesses to the execution of the codicil and to a separate trust agreement. Ms. Torres candidly admitted that she did not read any of the documents to which she was a witness. Thus Ms. Torres could not testify to the content of the codicil signed by the decedent. Cf. Bury, 591 So.2d at 677 (holding that the testimony by a witness to the execution of a will that the carbon copy produced at the hearing was identical to the original will executed by the decedent was sufficient to meet the requirements of a “correct copy” under the statute for proving the content of the lost original). The Co-Personal Representatives did not call the other witness to the execution of the will to testify at the hearing.
To summarize, the Co-Personal Representatives proffered a “correct copy” of the lost codicil in support of their amended petition. However, they failed to prove the content of the lost codicil with the testimony of at least one disinterested witness as required by section 733.207.
VI. CONCLUSION
We disagree with both of the probate court’s rulings discussed above. Nevertheless, the probate court’s careful consideration of the facts and the legal issues in this matter is apparent in its thorough and comprehensive order. The probate court’s order has facilitated our review of this appeal. Because the probate court properly denied the amended petition to establish the lost codicil, we affirm the order under review.
Affirmed.
LaROSE and BLACK, JJ., Concur.

. We initially disposed of this case by a per curiam affirmance without a written opinion. The Co-Personal Representatives filed a motion for rehearing including a request that the court issue a written opinion in accordance with Florida Rule of Appellate Procedure 9.330(a). We granted the motion in part and withdrew our original opinion. We now issue this opinion in its stead.

. The other copy of the codicil offered in evidence by the Co-Personal Representatives was generated by their attorney from an attachment that had been e-mailed from Mr. Allen’s office to their attorney's office. The two copies contained identical language, but their make-up differed slightly because they were generated with different computer software.

. See History of personal computers (Jan. 26, 2012, 8:38 p.m.), http://en.wikipedia.Org/w/ index.php?title=History_of_personaL computers & oldid=473394277.

. "A cloud database is a database that typically runs on a Cloud Computing platform, such as Amazon EC2, GoGrid and Rackspace.” Cloud database (Jan. 11, 2012, 7:00 p.m.), http://en.wikipedia.org/w/index.php?title= Cloud-database & oldid= 470836337. "Cloud computing is the delivery of computing as a service rather than a product, whereby shared resources, software, and information are provided to computers and other devices as a metered service over a network (typically the Internet).” Cloud computing (Feb. 6, 2012, 4:38 a.m.), http://en.wikipedia. org/w/index.php?title=Cloud_computing & oldid=475340599.

. Of course, we express no opinion on the merits of either of the potential claims against Mr. Allen. The possibility that such claims could be advanced and plausibly maintained is sufficient to give him a "private interest in the matter at issue.” See Black’s, supra (defining a disinterested witness as a person with no such interest).